**Joseph R. JACKSON, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**Nos. 20402, 21148.**

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 18, 1967.

Decided April 10, 1968.

Mr. E. Barrett Prettyman, Jr., Washington, D.C., with whom Mr. Peter F.

---

Rousselot, Washington, D.C. (both appointed by this court) was on the brief, for appellant.

Mr. Lee A. Freeman, Jr., Asst. U.S. Atty., with whom Messrs. David G. Bress, U.S. Atty., Frank Q. Nebeker and Joel D. Blackwell, Asst. U. S. Attys., were on the brief, for appellee.

Before WILBUR K. MILLER, Senior Circuit Judge, and BURGER and TAMM, Circuit Judges.

TAMM, Circuit Judge:

Appellant Jackson was convicted by a jury of murdering his former wife, Christine Savoy; and he also was convicted of assaulting Dr. Henry Pope, with intent to kill and with a dangerous weapon. The conviction on the first count was of murder in the first degree, but the jury did not fix the death sentence. At his trial, Jackson contended that Pope had been involved in an affair with Mrs. Savoy; that during a late night encounter, Pope had drawn a gun on him which discharged after a struggle, wounding Pope and killing Mrs. Savoy. Pope denied any affair, testifying that Mrs. Savoy had done part time secretarial work for him and that on the night in question he had followed her home from his office at her request because of the lateness of the hour. Pope asserted that after they arrived and while he was in his car, Jackson came out of the shadows and shot them both.

■ Sitting as a member of the jury which rejected Jackson's and accepted Pope's testimony, was one Kemper. Evidence elicited at a series of post trial hearings, if believed, would establish that Kemper had had an affair with a woman who had been killed by her husband some six months before Jackson's trial. Thus Kemper had been, appellant argues, the lover in a love triangle strikingly similar to the one alleged to have been involved here.

None of the questions asked on voir dire precisely foresaw the relationship that later came to light; but the area was probed generally. Defense counsel asked:

> Ladies and gentlemen of the jury, this case involves the relationship between a wife [the deceased], a husband [the defendant] * * * and an alleged lover of the wife [Dr. Pope]. * * * Has any member of the jury panel had any relationship in any domestic relations branch or in any criminal case in the District of Columbia in which the charge was that a person was trying to break up a marriage between a husband and wife?

Trial Transcript at 36. The trial court in his opening remarks to the jury told them that counsel would have the opportunity to ask them "whether you have ever had any experience in the past of your own that would in any way impose upon your mind a restriction so that you could not sit in this particular case and render a fair and impartial verdict based solely on the evidence that is presented in court." Trial Transcript at 8. Finally, government counsel asked generally, whether anyone knew "of any reason whatsoever why you as jurors could not * * * render a fair and impartial verdict * * *?" Trial Transcript at 33. There was no response to any of the questions. We feel that these questions go as far as may reasonably be expected of diligent counsel. We read defense counsel's question as directed to uncovering personal experiences of prospective jurors which might tend to color objective judgment on the "triangle" situation which would ultimately be revealed by the defense evidence. Certainly counsel's failure to envision juror Kemper's unique circumstances cannot be fatal to the appeal.

I

The evidence about Kemper's alleged affair, brought out at the post trial hearings, is summarized as follows. There is agreement that Mrs. Matressa Tibbs [1] died of gunshot wounds on December 6,

---

1. Mrs. Tibbs is also referred to in the transcripts of the hearings on appellant's motion for a new trial as "Patricia" and "Matricia."

1965, and that her husband was convicted of killing her. The dispute is over whether Kemper was having an affair with Mrs. Tibbs when she was killed. Kemper denied that anything other than a normal co-worker relationship existed between them. Three fellow employees at the CIA (where Kemper and Mrs. Tibbs had worked) said, in substance, they could not say whether there had been an affair. Mrs. Venetia Johnson [2] testified that the two had had an affair; that they had acted "like girlfriend and boyfriend." C Transcript at 34–35. The trial judge indicated that he disbelieved this testimony because of Mrs. Johnson's possible jealousy of Kemper. Mrs. Ann Kemper, the juror's wife, testified that she had found Kemper and Mrs. Tibbs in the Kemper apartment undressed on the sofa together. The judge discredited this because of Mrs. Kemper's ulterior motive to build a future divorce suit against her estranged husband.

Four photographs of Kemper and Mrs. Tibbs in clearly affectionate poses were also in evidence. We think these photos are most significant. Coupled with the other evidence, they seem to us to make incredible Kemper's testimony that only a co-worker relationship existed and to establish the probability of an affair.

The trial judge did not specifically find that no affair had occurred; he simply denied the motion for a new trial. The photographs tend to corroborate other testimony that some close relationship probably did exist and Kemper's explanation of the photos [3] is hardly plausible or convincing. Despite his indications of doubt about the credibility of Mrs. Kemper and Mrs. Johnson it is likely that the District Court Judge viewed this evidence as we now do. Thus, he must have concluded that even though Kemper had likely been involved in the described relationship, a new trial was not required as a matter of law. With great reluctance we conclude that, this being a capital case, the risk of prejudice present as to this juror was such that the only cure is a new trial.

## II

The sixth amendment commands that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, *by an impartial jury* \* \* \*." [4] (Emphasis supplied.) Where prejudice is manifest, a trial court's findings of jurors' impartiality should be set aside. Irvin v. Dowd, 366 U.S. 717, 723–724, 81 S.Ct. 1639, 6 L.Ed. 2d 751 (1961); Reynolds v. United States, 98 U.S. 145, 156, 25 L.Ed. 244 (1878). As was noted in *Irvin*, "'[i]mpartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula.'" 366 U.S. at 724–725, 81 S. Ct. at 1643–1644, quoting Chief Justice Hughes in United States v. Wood, 299 U.S. 123, 145–146, 57 S.Ct. 177, 81 L.Ed. 78 (1936).

We have found no cases in this jurisdiction involving facts similar to the bizarre facts of the case at bar. However, in United States ex rel. De Vita v. McCorkle, 248 F.2d 1 (3rd Cir.), cert. denied, 355 U.S. 873, 78 S.Ct. 121, 2 L. Ed.2d 77 (1957), the Third Circuit set aside a robbery conviction where it was disclosed at post trial hearings that a juror had earlier been a robbery victim. On voir dire, he had not responded when his attention had been directed to a question about any prior robbery experience. The court concluded that his potential bias constituted a denial of due process under the fourteenth amendment.

---

2. Mrs. Johnson is also referred to in the hearings transcripts as "Vanessa" and "Venecia."

3. Kemper, when examined about the photos, contended they were taken on group outings. On cross-examination, he could not recall which group (of two)

it had been, nor could be recall anyone who had been in the group; but he knew that the outings had been before 1962 because he had quit going with "that group" in 1962—the group he had previously been unable to identify.

4. U.S.Const. amend. VI.

Even more apposite is Durham v. State, 182 Tenn. 577, 188 S.W.2d 555, 160 A.L.R. 746 (1945). There a juror in a rape case had previously been a prosecution witness in an assault with intent to rape case, which had been placed on the "retired" docket, *id est*, prosecution of the case had been suspended, three years before the rape trial. In reversing the conviction, the Tennessee Supreme Court said:

> Surely, it requires no argument to convince that a man so circumstanced would not enter upon the trial of this accused free from that natural feeling of resentment which had moved him to institute and keep alive a prosecution for a like offense. As this case progressed his mind inevitably would turn to his own unsatisfied wrong and his judgment would be so affected thereby as to deprive him of the capacity to act impartially, disinterestedly, and dispassionately.

182 Tenn. at 587, 188 S.W.2d at 559. The juror had given no response with respect to his experience as a prosecuting witness, when asked on voir dire what experience he had ever had in court.

In Brown v. United States, 356 F.2d 230 (10th Cir. 1966), the Tenth Circuit refused to overturn a murder conviction where a juror, whose brother had been murdered some years before, failed to respond to a question whether any member of a juror's "immediate family" had ever been the victim of an attack on his person.[5] The court distinguished *McCorkle, supra*, as being a case of "positive nondisclosure." Apparently it considered the term "immediate family" as not including the brother involved and thus felt that an affirmative response to the question was not so clearly required. We find it difficult to make a meaningful distinction between the two "nondisclosures." In any event, we consider it unnecessary to do so.

Here, it is of little consequence that no question was propounded to juror Kemper which would have directly probed the unique similarity between his experience and this case because, at post trial hearings, he categorically denied any affair with Mrs. Tibbs. Accordingly, even if defense counsel had asked prospective jurors—as he did ask Kemper at the hearings—whether any of them had ever had an illicit relationship with a woman who had been murdered by her husband, Kemper would not likely have responded.

Problems abound in any attempt to analyze the subconscious impulses that Kemper may or may not have had toward appellant Jackson as a result of his experience. It is enough to say we think the facts give rise to a presumption that Kemper lacked the impartiality required of jurors by the sixth amendment and that Jackson was prejudiced thereby. Once such a presumption arises, as we noted in Ryan v. United States, 89 U.S. App.D.C. 328, 330, 191 F.2d 779, 781 (1951), cert. denied *sub nom.* Duncan v. United States, 342 U.S. 928, 72 S.Ct. 779, 96 L.Ed. 691 (1952), a judge's conclusion that a juror's impartiality has not been affected "may not rest entirely upon the testimony of jurors * * * because that alone is too uncertain a basis for resolving the issue of prejudice." Here, the only evidence supporting a conclusion that no affair took place was Kemper's own denial. If indeed such an affair took place, it is difficult to say that Jackson was not prejudiced. We conclude that Kemper's presence on the jury which convicted appellant had such a strong tendency to deny him a trial by twelve impartial jurors as guaranteed by the sixth amendment that we are constrained to order a new trial.

### III

One further matter requires comment. Appellant attacks the action

---

5. *But see* Photostat Corp. v. Ball, 338 F. 2d 783 (10th Cir. 1964); Consol. Gas & Equip Co. of America v. Carver, 257 F.2d 111 (10th Cir. 1958). In those two *civil* cases the Tenth Circuit granted new trials where jurors who had similar suits pending or completed failed to respond to questions whether they had ever been involved in similar litigation.

of the trial judge in excluding photographs of appellant's wife showing her as an "exotic dancer." Such photographs had only a minute—if any—relevancy to the issues in the case and their introduction in evidence would have served primarily to inflame the jury against the deceased Mrs. Savoy and her alleged paramour. The admission or exclusion of photographs necessarily rests largely in the trial court's discretion and as there was no abuse of that discretion here, his action will not be disturbed. Burns v. Beto, 371 F.2d 598, 601 (5th Cir. 1966).

The view we have taken of juror Kemper's disqualification precludes the need to deal with other points raised by appellant. The conviction and denial of a motion for new trial appealed from are reversed and the case is remanded for a new trial.

Reversed and remanded.