**UNITED STATES of America**

v.

**Henry PATTERSON, Appellant.**

**No. 71–1791.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 8, 1973.

Decided Jan. 17, 1974.

Rehearing Denied Feb. 8, 1974.

---

Allan M. Palmer, Washington, D. C., for appellant.

Joseph E. di Genova, Asst. U. S. Atty. with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry and Kenneth Michael Robinson, Asst. U. S. Attys., were on the brief for appellee.

Before BAZELON, Chief Judge, and TAMM and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

Appellant was convicted on two counts of possession of a muffler and a silencer for a firearm in violation of the National Firearms Act, 26 U.S.C. § 5861(d), (i), (1970). He contests the admission into evidence of a silencer and certain weapons procured by a search of his car. He also claims prejudice from an assertedly improper question asked by the prosecutor. We affirm.

## I. FACTS

Officers Ted J. Williams and Herbert Lopez testified that at 3:15 p. m. on June 17, 1970, while on routine patrol in an unmarked vehicle and in "casual clothes," they observed unusually large crowds on both sides of the 1900 block of 14th Street, N.W., in the District of Columbia. Williams turned his car around so that they could investigate further. Still in the car, they asked members of the crowd what had happened. One person told them that a man had been shot; after travelling a few more feet, they were told by another member of the crowd that not only had there been a shooting but that the as-

sailant was across the street. Appellant was seen across the street in animated conversation with another man.[1] Ending his conversation, appellant went from the rear of his car, where he had been standing, to the front and began to start the car. At this point, Officer Williams, who had just heard a "mumbling" from the crowd that the gun was in the rear of the car, turned his car around again and cut off appellant's car before appellant was able to move more than two feet. They placed appellant under arrest for assault with a deadly weapon and transported him and his car to the Third District Headquarters. The car was placed in a locked police lot, and was searched by the police after obtaining a warrant upon an affidavit by Officer Williams. Its text is reprinted in the margin.[2]

## II. SEARCH OF THE CAR

We hold that the search of appellant's car at the stationhouse upon receipt of a search warrant was valid, and that evidence secured thereby was properly admitted at trial. Having reason to believe that evidence of a crime was in appellant's car,[3] the police immobilized

---

1. Officer Williams also testified ·that he heard appellant's companion state "Get out of here man, police are coming," but since this allegation was not included in the affidavit for a search warrant, we do not include it in our statement of facts here.

2. AFFIDAVIT RELATIVE TO REQUEST FOR U. S. MAGISTRATE'S SEARCH WARRANT FOR 1970 FORD, BEIGE AND BLACK IN COLOR, DC TAGS 760–089,

   While on routine patrol, at 14th and U Streets, NW, Washington, D.C., on June 17, 1970, the undersign came on the scene of a shooting. From the on scene appearances the shooting had occured only moments before. The victim had received four shots in various parts of the body and has been transported to a hospital.

   A crowd had gathered on the scene and several persons in the crowd advised me that the occupant of the above described vehicle had done the shooting. Another officer arrested the occupant and is booking him at the time this affidavit is being prepared. The name of the occupant is not presently known to the undersign.

   Just prior to members of the crowd informing me that the above described occupant had done the shooting, I observed him coming from the rear of the above automobile. There was a muttering in the crowd to the effect that a gun was in the trunk of the above automobile. However, no member of the crowd would step forward and be identified as saying the gun was in the trunk.

   In view of all the above, particularly that the gun was not recovered although the undersign was on the scene within minutes after the shooting, that the members of the crowd kept stating that the gun was in the trunk, and that the undersign personally observed the suspect in this case near the area of the trunk, it is requested that a search warrant issue for the automobile described in the heading of this affidavit for the gun and in any other evidence of the offense.

3. We do not stop to consider the precise quantum of evidence a policeman must have before he has grounds for an investigatory stop. For our purposes here, it is sufficient to note that the level of evidence need not

the car until a search warrant could be obtained in much the same way as they may forcibly detain suspicious individuals for investigatory stops. *Cf.* Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 23 L.Ed.2d 612 (1972); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).[4] Without delay, Officer Williams drew up an affidavit and applied for a warrant to search the car.

Appellant contends that the affidavit did not specify facts sufficient for a judicial officer to find probable cause that contraband or evidence of a crime was secreted in the place or thing sought to be searched. Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Jones v. United States, 362 U. S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). In evaluating the sufficiency of affidavits, it should be recalled that they "are normally drafted by nonlawyers in the midst and haste of a criminal investigation. . . . A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting." United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965). Moreover, "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." *Id.* at 106, 85 S.Ct. at 744. Nevertheless, if there is to be even minimal judicial oversight, the magistrate must be presented with something other than the conclusions of the attesting officer. Giordenello v. United States, 357

U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958).

Problems arise when the affidavit is based, in whole or in significant part, on information supplied by informants. In Aguilar v. Texas, *supra,* the Supreme Court found constitutionally deficient an affidavit alleging that "reliable information" had been received from an unnamed and undescribed informant. Instead, the Court required that an affiant basing his assertions upon information supplied by an informant state some of the "underlying circumstances" that impelled the informant to his conclusions as well as some of the "underlying circumstances" that led the officer to believe that the informant was reliable and his information credible. 378 U.S. at 114, 84 S.Ct. 1509. These requirements have been interpreted in light of the facts peculiar to each case. In Pendergrast v. United States, 135 U.S.App.D.C. 20, 416 F.2d 776, cert. denied, 395 U.S. 926, 89 S.Ct. 1782, 23 L.Ed.2d 243 (1969), for example, a bruised and bloodied robbery victim pointed out his assailant from a group of spectators gathered at the scene. Not only did he identify his assailant, but he "supplied the salient details, and his bloody face gave credence to what he said. He pointed appellant out as one of the robbers, reiterating this identification several times and, in response to the officer's query, reaffirm[ed] his staunch belief that he was not mistaken." *Id.* at 28, 416 F.2d at 784. This court held that this informant had supplied enough of the underlying circumstances of his reliability and the reliability of his information so as to supply the probable

approach probable cause, nor need the source of the evidence be the officer's own perception. *Cf.* Adams v. Williams, 407 U. S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). We also do not pass on the validity of the warrantless arrest, although it should be noted that the policeman's determination of probable cause to arrest may well have included observations not included in the affidavit. *See, e. g.,* footnote 1.

4. Once it is conceded that the police may immobilize the situation long enough to pro-

cure a search warrant to investigate further, we think that it follows that the police may place a suspect's car in custody for the short time it takes to get a warrant. The alternative is to post a guard on a crowded street—possibly an inflammatory practice. In fact, once the suspect has been removed from the scene, placing the car in a locked lot operates to his benefit as well as to that of the police.

cause needed for arrest. See also Daniels v. United States, 129 U.S.App.D.C. 250, 393 F.2d 359 (1968).

No simple formula for evaluating the veracity of the information given to the police has emerged other than the general admonition that

> Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability. One simple rule will not cover every situation. Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forceable stop of a suspect would be authorized. But in some situations—for example, when the victim of a street crime seeks immediate police aid and gives a description of his assailant, or when a credible informant warns of a specific impending crime—the subtleties of the hearsay rule should not thwart an appropriate police response.

Adams v. Williams, 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972).

Officer Williams' affidavit related that a shooting had taken place and that the victim thereof had been hospitalized.[5] The magistrate was advised that unnamed members of the crowd had independently advised Officer Williams of the fact of a crime and had pointed out the alleged perpetrator. These were the kind of exclamations, hard on the heels of an excited situation, that provide the indicators of reliability, although not necessarily guarantees of trustworthiness, underlying the res gestae exception to the hearsay rule. McCormick, Evidence § 297 (2d ed. 1972). Moreover, Officer Williams added the corroborative fact that appellant was first seen standing near the trunk of the car, where he allegedly had just deposited the gun, then moved to the driver's seat and started off. Attempted flight is a factor to be taken into account in assessing probable cause. United States v. Davis, 147 U.S.App.D.C. 400, 403, 458 F.2d 819, 822 (1972); Green v. United States, 104 U.S.App.D.C. 23, 25, 259 F. 2d 180, 182 (1958).

Probable cause is "a plastic concept whose existence depends on the facts and circumstances of the particular case." Bailey v. United States, 128 U.S.App.D.C. 354, 357, 389 F.2d 305, 308 (1967). Although any one factor taken alone may be insufficient to provide probable cause, "when viewed in unison the puzzle may fit." United States v. Davis, 147 U.S.App.D.C. at 402, 458 F. 2d at 821. We are not here to second-guess the determination of the magistrate, but only to determine whether Officer Williams' affidavit supplied him with sufficient information upon which to base a determination of probable cause. We hold that it did.

## III. PROSECUTION IMPROPRIETY

Defense witness Anthony Crowner testified that he and appellant had been together inside a store until just before appellant's arrest. The prosecutor asked Crowner whether he knew that "the man had been shot right down there." His purpose apparently was impeachment, since he understood Crowner's testimony to say that when Crowner left the store, and saw the arrest, all was calm on the street. But the court had ruled that the prosecutor would be prohibited from informing the jury that appellant was arrested for assault with a deadly weapon or that a man had been shot where appellant was arrested. Defense counsel strenuously objected to the prosecutor's question particularly since the court had grudgingly agreed, in an earlier and lengthier colloquy, that it would permit only a narrower, more hypothetical, version of the question. When his request for a mistrial was denied, defense counsel alternatively requested a curative instruction advising the jury that there was no factual con-

---

5. Although the affidavit does not recite the precise source of this information, a fact subject to such quick and certain verification is unlikely to be falsified. The police are not required to track the details of how they became acquainted with widely known facts

nection between appellant's case and any shooting. That request was granted,[6] and the court instructed the jury that "anyone shot down the street except as crowds may have gathered, has nothing to do with this case. . . ."

Appellant now claims error in denial of a mistrial, arguing that the prosecutor's question placed before the jury highly prejudicial information with little materiality to any permissible issue at trial. The Government contends that the question was relevant on the issue of Crowner's credibility, in that he had at least impliedly asserted that the situation of the street was calm when he left the store.

There is little doubt both that the question should never have been asked, and that the prosecutor had been alerted as to its inflammatory nature. It is an axiom of the law of evidence that information will be excluded when its probative effect is outweighed by its prejudice to the opposing party. See Proposed Federal Rules of Evidence 403 (1972); McCormick on Evidence § 185 (2d Ed. 1972) and authorities cited therein. See also Macklin v. United States, 133 U.S.App.D.C. 347, 410 F.2d 1046 (1969); Jackson v. United States, 129 U.S.App.D.C. 392, 395 F.2d 615 (1962). Crowner testified that both he and appellant were inside at the time the alleged shooting occurred; by his account, the crowd was substantially dispersed by the time he left the store. Therefore, it would have hardly been inconsistent for him not to have noticed that a man had been shot. The damage to his credibility would have been slight indeed. Weighed against this was the prejudice inhering in the implied suggestion to the jury that appellant was somehow involved in the shooting down the street.

However, the District Court's response was prompt and unequivocal. Immediately after the offending question was asked, the court instructed the jury that "There is no connection shown in any way between the guns in this case and any shooting of anybody down the street, no connection at all." The fair implication of the court's statement is that there was neither legal connection, nor factual connection. There could hardly have been a more efficacious curative instruction, and we think that it virtually eliminated the possibility for prejudicial error.[7]

Affirmed.

---

6. THE COURT: Ladies and gentlemen: There has been some talk here about whether or not some person was shot down the street. Let me say this to you: Whether or not someone was shot down the street has no relevancy whatever to this case unless it would be shown that large crowds were around and that the circumstance was not as some witness might say calm and peaceful and so on, it would have no other purpose whatever. There is no connection shown in any way between the guns in this case, and any shooting of anybody down the street, no connection at all. And the jury will not consider them in any relationship thereto. * * * The charges in this case are two, and two only, and that, is, that this defendant had in his possession a firearm or a certain silencer which the statute defines includes a silencer, had a firearm which the statute interprets and defines as including a muffler or silencer, and that it wasn't registered; and two, it didn't have serial numbers on it as required by law.

And I say again, anyone shot down the street except as crowds may have gathered, has nothing to do with this case. (Tr. I 114–115.)

7. Appellant protests failure to give an instruction on joint possession of the gun. We think the instruction that constructive possession requires "the power and intention at a given time to exercise dominion and control" sufficed to avoid error and prejudice.

Relying on United States v. Bryant, 142 U.S.App.D.C. 132, 439 F.2d 642 (1971), appellant requests a dismissal of the indictment as a sanction for non-disclosure based on loss of evidence, in view of the Government's failure to account for a possible police report of efforts to raise fingerprints on the weapons found in his car. *Bryant* was concerned with a prophylactic rule to assure that the Government instituted "procedures designed to preserve all discoverable evidence gathered in the course of a criminal investigation." (439 F.2d at 652). But here there were police procedures for preservation of this evidence. The problem is that occasionally even with the best of pro-

BAZELON, Chief Judge, concurring in part and dissenting in part:

I concur in part II of the court's opinion. I disagree, however, with two conclusions reached in part III.

## I

The first relates to the trial court's refusal to declare a mistrial sought by the defense on the ground that the prosecutor asked a highly prejudicial improper question in the face of a stern warning from the trial court not to do so. The prosecutor's question may have suggested to the jury that there was some connection between the weapons found in appellant's car, and a shooting that had occurred at the time and near the scene of his arrest.[1] This revelation was blatantly prejudicial; it is too fanciful even to speculate that a curative instruction could erase the damage.[2] Nevertheless, this court sustains the refusal to grant a mistrial, thereby tacitly condoning, rather than forthrightly condemning, inexcusable prosecutorial misconduct. The effect is to undermine confidence in the fair administration of justice in this jurisdiction.[3]

## II

The second conclusion relates to the court's holding that the government's failure to produce a fingerprint report was not fatal. I find the present record inadequate for disposition of this issue.

Appellant's defense, based on the testimony of one witness, was that someone had borrowed his car on the day in question, and unbeknownst to him had placed the weapons in his trunk. He argued at trial, and again on appeal, that he

---

cedures reports get mislaid, and the question is, what to do?

This is not a case where a question as to fingerprints on the weapon had been timely raised by defense counsel. In such case, there would have been a basis to contend to the District Court that the rules were paper rules, and not systematic procedures enforced in good faith.

In this case, as the trial court noted (Tr. I 175), experienced defense counsel did not telephone in advance to find out whether any fingerprints had been found. Defense counsel showed no interest in the weapon, or any possible fingerprints thereon, before or at trial, until Officer Lopez testified that some effort had been made to lift the prints. The reality is, as Officer Dion testified without contradiction, that the chances of lifting identifiable fingerprints from a handgun or silencer are about one in ten (Tr. I 168). The Government was willing to stipulate that no prints were found on the gun or the silencer (Tr. I 155).

The interest belatedly shown by defense counsel in the fingerprint issue enabled him to make an effective "missing witness" kind of argument to the jury. See, e. g., Tr. II 238: "Obviously, if Patterson's prints were found, you would have seen it on the stand. However, isn't it strange that the printing officer is not produced by the Government?" The argument was sustained over the prosecutor's protest.

Moreover, the trial court did not shut out further inquiry into the matter of fingerprints taken. Rather he ruled (Tr. I 175) that "if this defendant is convicted and it is found out that [the officer] took fingerprints and that they were identifiable, I will grant a new trial . . . If they were identifiable for anybody other than the defendant." That ruling is part of the record, and is in effect incorporated in both the judgment of the trial court and this court's affirmance. We fail to see how the defendant can assert prejudice from this handling of the matter by the trial judge, especially taking into account the lateness of the defendant's inquiry and the fact that the officer who handled the fingerprinting was on leave at trial time. What the trial court did was responsibly addressed to any substantial claim of defendant, and requires no interposition on our part in the interest of justice.

1. For a discussion of the question, and the context in which it was asked, see pp. 111–112 *supra*.

2. *See* Macklin v. United States, 133 U.S. App.D.C. 347, 410 F.2d 1046 (1969) ; *cf.* Lee v. United States, 125 U.S.App.D.C. 126, 368 F.2d 834 (D.C.Cir.1966).

3. We have in the past reversed several convictions secured by this former assistant U. S. Attorney because he went beyond the bounds of permissible advocacy. *See* United States v. Carter, 157 U.S.App.D.C. 149, 482 F.2d 738 (1973) ; United States v. Whitmore, 156 U.S.App.D.C. 262, 480 F.2d 1154 (1973) ; United States v. Hawkins, 156 U.S. App.D.C. 259, 480 F.2d 1151 (1973) ; United States v. Phillips, 155 U.S.App.D.C. 93, 476 F.2d 538 (1973).

should be given access to any fingerprint report in the possession of the government because it might show that the prints on the weapons were those of the man whom appellant claims placed the guns in his car. The government answered that it was unable to locate any fingerprint report. The evidence indicated that some effort had been made to lift prints from these weapons. The officer who had initialled the weapons, indicating that he had fingerprinted them, was on vacation at the time of trial. Appellant subpoenaed his supervisor who testified that department regulations required that all attempts to lift prints, even unsuccessful ones, were to be entered in "department log books." He also said that he had checked the books, but found no entry with respect to the weapons in question. The trial court ruled that nothing could be done at that time because the fingerprinting officer was unavailable. He said that if the defense could subsequently show that the government had suppressed the fingerprint report, or that "there were fingerprints favorable to the defendant," he would order a new trial. The record reflects nothing further on this issue.

I would remand to determine what, if any, efforts were made to contact the officer who supposedly tried to lift the prints, and what was the outcome of such efforts. The majority opinion fails to consider this question.

I would also remand because the trial judge ignored our decision in United States v. Bryant, 142 U.S.App.D.C. 132, 439 F.2d 642 (1971), and therefore limited his concern to the issue of suppression of the fingerprint report. *Bryant*, however, held that the government would be responsible not only for suppressing evidence, but also "for non-disclosure based on loss of evidence . . . unless [it] can show that it has promulgated, enforced and attempted in good faith to follow rigorous and systematic procedures designed to preserve *all* discoverable evidence gathered in the course of a criminal investigation." [4] 439 F.2d at 652 (emphasis in original).

The majority dismisses appellant's *Bryant*-claim on the ground that:

> here there were police procedures for preservation of this evidence. The problem is that occasionally even with the best of procedures reports get mislaid, and the question is, what to do?

The answer, in short, is to establish affirmatively that the most earnest efforts were pursued to recreate the substance of the lost evidence. In the present case, the agent who tried to fingerprint the weapons could be called; he might be able to reveal whether his efforts were futile or fruitful, and if fruitful, whose prints were discovered. Such a procedure would enhance the appearance of justice, if not its substance.

Moreover, when evidence is lost due to an apparent failure to comply with existing procedures, and its substance cannot be recreated, *Bryant* requires a hearing to insure that the government has adequately "enforced" the procedures, and that there has been a "good faith" effort to abide them in the case at hand. To be sure, there will be times when evidence is lost, and cannot be recreated, despite scrupulous efforts to follow comprehensive procedures. Lacking a crystal ball, however, I prefer to make that determination on the basis of a full factual record, rather than on the blind guess of my brethren.

The majority claims that such an inquiry was not required in this case because "[d]efense counsel showed no interest in . . . any possible fingerprints," until testimony at trial indicated "that some effort had been made to lift the prints." As soon as counsel was advised that there had been an effort made to lift prints, he explicitly called the *Bryant* case to the attention of the

4. *See also* Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ; Levin v. Katzenbach, 124 U.S.App.D.C. 158, 363 F.2d 287 (1966) ; Levin v. Clark, 133 U.S. App.D.C. 6, 408 F.2d 1209 (1967).

court. Thus, the failure to hold a *Bryant*-type hearing was due to the court's unwillingness to apply that decision, and not to counsel's failure to "timely raise" the issue, as the majority suggests. Indeed, if appellant's *Bryant*-claim was foreclosed by counsel's failure to act promptly, appellant may have received ineffective assistance of counsel. In United States v. DeCoster, 487 F.2d 1197 (1973), we held that one of the obligations of defense counsel was to make "efforts to secure information in the possession of the prosecution and law enforcement authorities." (Id. at 1204.)

In short, appellant was denied the benefits of a full factual hearing into the missing report either because of the trial court's refusal to apply *Bryant,* or his counsel's ineffectiveness. Thus, I cannot join my colleagues in concluding that it is appellant who must suffer the consequences.[5]

5. The majority "fail[s] to see how the defendant can assert prejudice from this handling of the matter by the trial judge . . . ." The prejudice alleged, and suffered, was a denial of rights protected by *Bryant.* A hearing may have uncovered fingerprint evidence strongly corroborating appellant's defense, or it may have indicated that the government failed to satisfy *Bryant.*