UNITED STATES of America

v.

David WANDER, Edward Reddington.

Crim. A. No. 78–34.

United States District Court,
W. D. Pennsylvania.

Feb. 7, 1979.

Robert J. Cindrich, U. S. Atty., Pittsburgh, Pa., for plaintiff.

Brendan Sullivan, Jr., Williamson & Connolly, Washington, D. C., James Weisman, Weisman, Passafume, Swartz & Trimm, Pittsburgh, Pa., for defendant Wander.

George Schumacher, Pittsburgh, Pa., for defendant Reddington.

OPINION

SNYDER, District Judge.

The Defendants have filed parallel motions under Rule 33 of the Federal Rules of Criminal Procedure [1] that we suggest to the

---

1. Rule 33, Fed.R.Crim.P. provides:

"*New Trial.* The court on motion of a defendant may grant a new trial to him if required in the interest of justice. If trial was by the court without a jury the court on motion of a defendant for a new trial may vacate the

United States Court of Appeals for the Third Circuit that we would grant a new trial on remand of the record because of newly discovered evidence that a juror, Rose Marie Mullinary, deliberately concealed information on voir dire which, if disclosed, would have caused her to be stricken from the jury. We decline to do so.

## I. THE BACKGROUND

On February 6, 1978, a seven count indictment was returned against David Wander and Edward Reddington. The first count charged, in substance, that from May 5, 1972 to on or about January 2, 1976, Wander, Reddington, and others unknown, conspired to use facilities in interstate commerce, to-wit, commercial airlines and the Bell Telephone system, between the State of Florida and the Commonwealth of Pennsylvania with the intent to promote, manage, establish, carry on and facilitate an unlawful activity, to-wit, the extortion of Michael Lynn Currie and Robert N. Peirce, Jr., in violation of the laws of the Commonwealth of Pennsylvania and the United States Criminal Code, Title 18, Section 1952(a)(3),[2] in violation of Section 371 of Title 18 of the United States Code.[3] Counts Two through Seven charged the use of facilities in interstate commerce with the intent to promote, carry on, or facilitate the unlawful activity, i. e. the extortion of Michael Lynn Currie and Robert N. Peirce, Jr., on various dates.

At trial, the Government's evidence was to the effect that Michael Lynn Currie was involved in an automobile accident early in 1972 and was referred to Robert N. Peirce, Jr., Esquire to represent her on a personal injury claim. At the time, Peirce was the elected Clerk of Courts for Allegheny County. He had been appointed to that office in February, 1971, ran for election in the Fall of 1971, and was elected to a four-year term commencing January, 1972. While serving his appointed term, Peirce initiated a number of reforms with respect to bail and bail bond forfeitures. His activity, together with that of the Allegheny County Bar Association, culminated in the introduction of a bail reform act in the Pennsylvania Legislature which established a public bail bond agency, the right of defendants to post an 8% cash bond instead of surety bond, and expanded the use of nominal and "own recognizance" bonds in the state system. An order was entered in the Criminal Division of the Allegheny County Court of Common Pleas in February of 1972 which required professional bondsmen to deposit one hundred thousand dollars collateral to qualify to write bail bonds. The effect of the order was to reduce the number of qualified surety bondsmen in Allegheny County to two, David Wander and Steven C. Levitt, who had satisfied the collateral requirement in June, 1972. Both Wander and Levitt had been out of the surety bond business in Allegheny County between February and June of 1972.

judgment if entered, take additional testimony and direct the entry of a new judgment. A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case. A motion for a new trial based on any other grounds shall be made within 7 days after verdict or finding of guilty or within such time as the court may fix during the 7-day period."

**2.** Section 1952(a)(3) of Title 18, United States Code, provides:

"Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to— * * *

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be" guilty of an offense.

**3.** Section 371 of Title 18, United States Code, provides in pertinent part:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be" guilty of an offense.

On May 5, 1972, Michael Lynn Currie and Joseph Volpini were involved in an automobile accident (Currie's second) in McKeesport, Pennsylvania, which resulted in the discovery of marijuana in their possession, as well as a darvon capsul in Currie's possession. They were arrested by McKeesport Police Officers and charged with unlawful possession of marijuana; Volpini also was charged with a number of motor vehicle violations arising out of a high speed chase which ended in the accident, and Currie also was charged with possession of a controlled substance. They spent the night of May 5th in the McKeesport Jail and were released on $5,000, 8% cash bond, which was posted by Volpini's father on May 6, 1972. Following a preliminary hearing before Magistrate Charles Johnson on May 18, 1972, Currie was held for the grand jury, Volpini having waived preliminary hearing.

In the Spring of 1972, Currie became acquainted with Edward Reddington and occasionally stayed at his apartment, which was also occupied from time-to-time by his step-daughter, Becky Forsythe. Reddington obtained employment for Currie at Richard's Hair Stylist and she was steadily employed there until March, 1973 when she left Pittsburgh to live with her daughter, Mona, at the residence of her sister, Kathy Allen, in Florida.

During the early months of 1972 while Peirce was handling her personal injury claim, he engaged in some flirtatious talk with Currie about getting together with her at some location in the Pittsburgh area. Reddington became aware of Peirce's interest in Currie and passed this information along to Wander, and he also made Wander acquainted with Joseph Volpini. Reddington undertook to have Wander "fix" Volpini's case so that he would be found not guilty. This arrangement did not, however, include the "fixing" of Currie's case, but Volpini was aware of Wander's interest in using Currie to compromise Peirce and Wander's proposal that she do this as a condition of "fixing" her case. Reddington and Currie had several discussions, and Currie was told that if she did not agree to the compromise of Peirce, she would be found guilty and receive a jail sentence on the state charges, and thereby lose any chance for custody of her daughter. Although the proposition was made by Reddington, it was Wander's interest as a bondsman which was to be served in the compromising of Peirce.

Currie met with Wander on one occasion during the Summer of 1972, at which time Wander expressed an intense dislike of Peirce. The fixing of her case was to be handled by Wander.

The Criminal Court records show that the *Volpini-Currie* case was tried before a judge of that court on October 19, 1972, and consisted chiefly of a suppression hearing and testimony relative to Volpini's motor vehicle violations. Decision was reserved and disposition of the case scheduled for December 15, 1972. It did not take place and the attorneys were noted to be out-of-town. The attorneys involved, however, testified in our case that they were in town and did not request a continuance. Final disposition of the *Volpini-Currie* case was rescheduled several times early in 1973, but was continued on all such occasions.

About March 1, 1973, Currie left Pittsburgh for Florida because of a serious falling out with Volpini, and took her daughter with her. While in Florida, Currie received a telephone call from Reddington advising her that Wander wanted to talk with her. Wander telephoned her shortly thereafter, stating that he wanted to monitor a phone conversation between Currie and Peirce in order to know if an arrangement was possible. Wander then arranged a telephone hookup between Currie and Peirce during which Currie talked in general terms with Peirce. Following this conversation, Wander said everything sounded alright, and he terminated the Florida telephone call.

On March 12, 1973, Reddington called Currie in Florida and advised her to come to Pittsburgh for the final disposition of her case. She later flew to Pittsburgh, was met at the airport by Reddington and/or Becky Forsythe and taken directly to Reddington's apartment. On March 15th, at Redding-

ton's direction, Currie registered at the Quality Courts East Motor Inn in North Versailles, Pennsylvania, and was assigned a room. She telephoned Peirce with the suggestion they meet at the motel the following day; Peirce agreed. Currie then returned to Reddington's apartment where she spent the night. She returned to her room at the motel early the next morning.

Peirce telephoned Currie on March 16, 1973 to confirm the meeting and then proceeded to the motel, where he and Currie went to bed. While in bed, an unknown male entered the room, snapped photographs of Peirce and Currie, and exited through the sliding glass doors which opened onto a parking lot. Peirce returned to the Clerk of Courts' office, and Currie telephoned Reddington to pick her up, and she went back to his apartment. Later that afternoon, Currie telephoned Peirce and denied any involvement or knowledge of the person taking the pictures, but she suggested it might have been her husband, from whom she was separated and with whom she was still having difficulty about the custody of their daughter. Currie then returned to Florida, without any disposition of her case which, in fact, was not then scheduled.

The court records show that disposition of the *Volpini-Currie* cases was set for March 30, 1973. Currie did not appear, and Volpini called her in Florida to tell her the Assistant District Attorney was very upset and had tried to have her bond revoked. Currie called Reddington, and he told her not to worry about anything.

About May 1, 1973, Currie received a call from Reddington to return to Pittsburgh for the disposition of her case. The court heard the matter three days later, denied the defendants' motion to suppress evidence, and entered a judgment of acquittal for Volpini and Currie on the narcotic charges. Volpini was convicted on one motor vehicle violation and was fined $100.00. Joseph Kanfoush, Currie's attorney, testified in the instant matter that he had asked Currie if the state case had been fixed because he had not even been notified. She

told him it had been fixed, the fix involved photographs of herself and Peirce, and that Wander was involved. Kanfoush testified he confronted Wander with this allegation and that Wander had denied any involvement. Kanfoush also testified that on a number of occasions Wander had made snide references to Currie.

Shortly after Peirce was photographed in the motel, he contacted John S. Portella, an Agent of the Federal Bureau of Investigation whom Peirce had met during his representation of a defendant in Federal Court and also socially on several occasions. Peirce told Portella about the motel incident and identified Wander as the principal suspect in his mind, because of his bond reform activity and Wander being in the bonding business. Portella undertook an inquiry and, in the summer of 1973, was successful in procuring the photographs and negatives through Robert Butzler, the Ross Township Chief of Police. Butzler was told to contact Wander by an informant, and he asked Wander for any assistance he could provide. Several weeks later, Butzler received a call from Wander telling him that he had something Butzler was interested in. Butzler met Wander in the parking lot of a supermarket and got the photographs, two disc type recordings and a recording machine. Butzler then turned these over to Elsie Hillman, a friend and political sponsor of Peirce, and she gave them to Peirce. Peirce destroyed the recordings in a local hotel, although Portella asked that they be preserved.

The jury trial on the federal indictment began May 23, 1978, and a verdict was returned on June 6, 1978 finding Wander and Reddington guilty on Counts One, Two, Three and Four, and not guilty on the remaining counts. The jury apparently believed that the telephone calls charged in these later counts had more to do with Currie's own accident than with any intent to carry on the unlawful activity of extortion.

On July 13, 1978, the following sentences were imposed:

*David Wander*

Count One: Imprisonment for a period of two years, pay a fine of $5,000 and ½ the costs of prosecution.

Counts Two, Three and Four: Two years imprisonment on each count, to run concurrent with the sentence imposed on Count One.

*Edward Reddington*

Count One: Imprisonment for a period of three years.

Count Two: Imprisonment for a period of three years, to run concurrent with the sentence imposed on Count One.

Count Three: Imprisonment for a period of three years, to run consecutively with sentence imposed on Counts One and Two.

Count Four: Imposition of sentence suspended and the defendant placed on probation for four years.

Appeals were promptly taken to the Court of Appeals for the Third Circuit and are now scheduled for hearing on February 21, 1979.

## II.  THIS PROCEEDING

By motions filed, the Defendants claim that Juror Mullinary lied to the Court and to counsel on voir dire, withholding information which was embarrassing to her and her family, and thereby thwarting the voir dire process to such an extent that the Defendants were denied their constitutional right to an impartial jury.  During voir dire, each of the prospective jurors was questioned by the Court, in the presence of the Defendants and counsel, to determine whether such juror, or any member of his or her immediate families, had contact with Defendant Wander, or had ever been on bond in a criminal case.  The relevant questions and answers were:

1.  TO THE PANEL AS A WHOLE:

"Q.  Are you personally acquainted with either of the Defendants, related to them by blood or marriage, or do you or does any member of your immediate family have any connection of any kind with either of these Defendants?"

None of the members of the panel responded in the affirmative to this question.

2.  TO JUROR MULLINARY:

"Q.  Have you or any member of your family ever been bonded or otherwise had to post bail or security in a criminal proceeding?

A.  Not that I know of.

Q.  Do you presently or have you in the past ever believed that the bail bond business is corrupt in Allegheny County?

A.  Having not had any experience at all in bail bonding, I really don't know anything about it.  So I—I would not say I thought it was corrupt, because I have not had any experience with it.

Q.  Do you presently or have you in the past ever believed that some of the bail bondsmen in Allegheny County are corrupt or untrustworthy?

A.  Being human, I am sure that some of them are able to be corrupted.  But I don't have any prior knowledge of anything as far as any experience—personal experience with any of that."

Defendant Wander's Motion has attached thereto the recently obtained affidavits of Robert V. Mullinary and Louis C. Mullinary which state, in part, that they are the sons of Juror Mullinary and that each of them had been released in a criminal case on a bond which had been written by David Wander.  Robert was arrested, jailed, and posted bond in 1976, and Louis was arrested, jailed, and posted bond in 1969.  The affidavits were claimed to demonstrate that each of her sons had called Juror Mullinary from jail to seek her assistance in procuring bond for them, and that each had told her that the magistrate had set their bond at an unreasonably high level.  The affidavits indicate that each of her sons had reported to Juror Mullinary concerning their arrest, and that she had become very upset and angry about each incident, including the payments to bondsmen.

After presentation of the Motions to the Court, in the presence of all counsel and by agreement of all counsel, including counsel for the Government, a subpoena was issued to Juror Mullinary for a hearing that same afternoon. Mrs. Mullinary appeared at the time scheduled, without previous knowledge of the purpose of said hearing, and gave her testimony.[4] Mrs. Mullinary recalled being asked the previously quoted questions, as well as the responses which she made. With respect to the question put to the panel as a whole by the Court, she was asked (Transcript, p. 9):

"Q. Do you recall that the Court's instructions that, if your answer to that question was yes, you were to raise your hand and bring it to the attention of the Court? Do you recall that?

A. Yes.

Q. Now, at that time, you did not raise your hand. Is that correct?

A. No, because I don't know them."

Mrs. Mullinary further testified that Robert V. Mullinary was her son and that she knew he had been picked up for drunken driving, leaving the site of an accident and assaulting an officer, and a couple of other charges. She said Robert was presently in Seattle, Washington and had not been in touch with her in any way about the *Wander* case, either during or since the trial. She stated that at the time of Robert's arrest, she was concerned that he take care of his own problems. She denied that she had helped him in any way, given him any money toward his bond, or that she knew anything about the circumstances under which he was released on the charges. She stated (Transcript, p. 14):

". . . ., I did not really know what the procedure was when my sons went down, because I think a couple of my sons went down. But I did not question. I did not ask any questions about it, and I did not

have any information, and he did not offer any. So we left it just like that."

She was then asked the following question and gave the answer indicated (Transcript, p. 15):

"Q. At any time prior to trial, at any time, had you heard anything whatsoever from anyone about the character or reputation of either of these defendants, either Reddington or Mr. Wander?

A. No. I was not familiar at all with their names."

Mrs. Mullinary also stated that Louis Charles Mullinary was her son and recalled that he had been arrested in 1969 when marijuana was found in an apartment. She said he had gotten in touch with her and wanted her to come down and bail him out, but she refused to do so. Instead, she got one of his friends to go down to see him because she was financially unable to do anything at the time and had nothing to do with raising his bail. She said she was "terrorized" that her husband would find out about the affair and said all that she knew was that Louis had been bailed out, but did not know who the bondsman was.

The following question and answer was then recorded (Transcript, p. 18):

"Q. Based on all the experience which we have just gone over, were your deliberations in this case in any way the result of a hostile or prejudiced attitude against either of these defendants?

A. I don't think so, because I did not—I was not even aware that my sons had been bonded and who the bonding company was. So I did not have any reason, because I did not know Mr. Wander or Ed Reddington at all."

Furthermore, she stated that these matters were never discussed with any of the other

---

4. In the circumstances of this case, the Court concluded it had jurisdiction to hear the motion, even though the case was on appeal, *see Richardson v. United States*, 360 F.2d 366 (5th Cir. 1966), and that we could either deny the motion or make a determination that we should advise the appellate court of a disposition to grant the motion for new trial, if the appellate court would entertain a suggestion for remand. *See United States v. Smith*, 433 F.2d 149, 152 (5th Cir. 1970); 8A *Moore's Federal Practice* ¶ 33.03[2] (1978 Rev.Ed.).

jurors because she was not even thinking about them at the time.

Mrs. Mullinary was then excused and counsel were asked for any further interrogation they desired. Numerous questions were suggested, most of which were adopted by the Court.

During the second phase of interrogation, Mrs. Mullinary denied discussing the case, during the trial, with her sons. She said neither of them had ever told her that they had been bonded by Wander or through Reddington. She denied that either of her sons had told her about their confinement or the circumstances of their release prior to the Wander trial, or that she had heard anything about the scandal arising out of various charges made by the United States Attorney against the Allegheny County magistrates, or any rumors whatsoever about either Reddington or Wander being members of the underworld. She said that neither of her sons ever told her they had been interviewed or had made sworn statements in connection with this case.

Mrs. Mullinary denied knowing exactly what the charges against her son Louis had been, and stated she was upset at the time of his arrest because she was afraid her husband would find out about it. (Transcript, p. 35–6). She said she washed her hands of the entire matter, explaining, "I did not have the money first of all and I suppose, because I was very terrorized that my husband would find out, I did not want anybody or anything said about the incidents at all around the house." (Transcript, p. 36). She admitted she had been asked and had given the following answer at the time of voir dire questioning:

"Q. Have you or any member of your family ever been bonded or otherwise had to post bail or security in a criminal proceeding?

A. Not that I know of."

When asked why she had responded in this manner, she said (Transcript, p. 38):

"Yes, and that is at the time I was not even thinking about my sons having those involvements and, since I did not go down to the court, I did not really know what went on."

## III. THE CONTENTIONS

The Defendants stress that David Wander had been a bail bondsman for many years in the Courts of Pennsylvania, especially in the years immediately preceding the trial, and that there had been numerous allegations that the bail bonding system was corrupt, including allegations that bondsmen received preferential treatment from the Clerk of Courts, that magistrates were receiving kickbacks from the bondsmen, and that bondsmen did fix the cases of persons on bond to them. Defendants charge that in this very case, the United States asserted that Wander's motive for taking the compromising pictures of Peirce, then Clerk of Courts, was precisely because he was refusing to extend to Wander corrupt preferences previously enjoyed. Moreover, they point out that the central point of the Government's case was its assertion that Wander had extorted Currie by promising to "fix" a state court drug charge if she cooperated in compromising Peirce. Counsel charges that because veniremen drawn from the Pittsburgh area might have been exposed to the extensive publicity about the alleged corruption in the bonding system, they might have drawn an inference that Wander, a bondsman, was corrupt, or that the judge in Currie's trial was corrupt, and state it was for this reason that Defendant Wander wanted to know whether the jurors or any member of their immediate family knew or had heard about the bonding system. For equally important reasons, counsel wanted to learn if any jurors, or members of their immediate families had come in contact with the bonding system by having been required to post bond in a criminal case, since if such was the case, they may have formed opinions about the system or the individual bondsmen. They say the Defendants were concerned that veniremen who had children who had been arrested would be unsympathetic to one of the defenses, i. e. that Currie was not to be believed because, during the times in question in the trial, she was a steady drug user who had been arrested for drug posses-

sion. Any indication that a potential juror, because of such experience, might empathize or sympathize with Currie's self-portrayal as an extortion victim in connection with her drug case—especially any testimony that she believed her case could be, or was, corruptly influenced by Wander—would have been reason for defense counsel to move to strike such juror for cause and, in any event, to utilize peremptory strike. They charge specifically that based upon the testimony taken at the hearing it is clear that Juror Mullinary was aware that her sons had been arrested, held in jail, subjected to unusually high bond, and that, in a very real sense, corruption in the bail bond system might have affected her family.

Counsel states, "In short, were the truth known, juror Mullinary was precisely the sort of juror that Wander wanted excluded from the panel that would pass on his guilt or innocence. Had Wander's counsel known in May of 1978 what they know today, they certainly would have moved to strike juror Mullinary for cause and, had this motion been denied, would unquestionably have stricken her peremptorily from the jury." Because the truth was suppressed, they claim they were deprived of a Sixth Amendment right to be tried by an impartial jury and should therefore be granted a new trial.

## IV. DISCUSSION

When final judgment was entered against Wander on July 13, 1978, appeal was taken, as previously noted, and hearing is scheduled for February 21, 1979. Consistent with our understanding of the law, we have given Defendants prompt hearing on their motions so that the Court of Appeals may have our ruling on the matter.

■ When a Rule 33 Motion is filed, although the case is pending on appeal, jurisdiction remains in this Court to hear the matter. Thus, in *United States v. Smith*, 433 F.2d 149, 152 (5th Cir. 1970), the following appears:

"That the district court did not have authority to *grant* a motion for new trial while the case was on appeal does not mean, however, that the district court did not have jurisdiction to *hear* the motion. *United States v. Hoffa*, D.C.Tenn.1965, 247 F.Supp. 692. Rule 33 in no wise prevents the district court from denying a motion for new trial while the case is on appeal, *see Richardson v. United States*, 5 Cir. 1966, 360 F.2d 366, but merely provides that the district court may not grant the motion until the case has been remanded by the appellate courts. When a motion for new trial is made while the cause is on appeal, the motion is in substance one calling for the district court to make a determination of whether it should advise the appellate court that it is disposed to grant the motion for new trial if the appellate court will entertain a suggestion for remand. *Knight v. United States*, 5 Cir. 1954, 213 F.2d 699; *Rakes v. United States*, 4 Cir. 1944, 163 F.2d 771."

*Cf. United States v. Conway*, 415 F.2d 158, 166 (3rd Cir. 1969), *cert. denied* 397 U.S. 994, 90 S.Ct. 1131, 25 L.Ed.2d 401 (1970). *See generally* 8A *Moore's Federal Practice* ¶ 333.03[2] (1978 Rev.Ed.).

Thus, when the instant Motion was presented, as supported by affidavits, the Court felt impelled immediately to have a hearing at which the juror's testimony could be taken. The testimony of any witnesses proposed to be interrogated by the Movants could be done at their earliest convenience, but necessarily at some later date, since some were residents of the State of Washington.

■ We further considered that "newly discovered evidence" which will support a new trial motion is not limited to evidence going to the merits of the case. It has been held "[s]imilar motions founded upon after-discovered evidence affecting the integrity of the jury's verdict have been treated as based upon newly discovered evidence within the meaning of the procedural rule [*i. e.*, Rule 33]. *Rubenstein v. United States*, 10 Cir., 227 F.2d 638. *See Massicot v. United States*, 5 Cir., 254 F.2d 58; *Armstrong v. United States*, 8 Cir., 228 F.2d 764."

*Holmes v. United States*, 284 F.2d 716, 719–720 (4th Cir. 1960). *Accord, Richardson v. United States*, 360 F.2d 366, 368–69 (5th Cir. 1966); *Rubenstein v. United States*, 227 F.2d 638, 642 (10th Cir. 1955); *United States v. Mitchell*, 410 F.Supp. 1201, 1202 (D.D.C.1976), *aff'd*, 181 U.S.App.D.C. 254, 559 F.2d 31, *cert. denied* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). Of course, the evidence tendered as "newly discovered" must have, in fact, been found after the close of the trial, and there is an obligation to bring such matters diligently before the trial court. All of these requirements have been fulfilled in the instant matter, and the Court so finds.

█ The basis for the instant motion for new trial is the Sixth Amendment guarantee of a "right to . . . trial, by an impartial jury." The test for granting or denying the motion is whether there was actual prejudice on the part of the juror that would influence his or her judgment of the case. *United States v. Silverman*, 449 F.2d 1341 (2nd Cir. 1971), *cert. denied* 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788 (1972); *United States v. Cavell*, 287 F.2d 792 (3rd Cir. 1961); *United States ex rel. Devita v. McCorkle*, 248 F.2d 1 (3rd Cir. 1957), *cert. denied* 355 U.S. 873, 78 S.Ct. 121, 2 L.Ed.2d 77 (1957).

In *United States v. Poole*, 450 F.2d 1082, 1084 (3rd Cir. 1971) the Circuit Court held it reversible error for a district court in an armed robbery case to refuse to allow a voir dire question pertaining to prior experience as a victim of a crime because "it would be difficult to hold that such a juror ["who had once been a robbery victim"] was capable of objectivity."

In *Virgin Islands v. Bodle*, 427 F.2d 532, 534 (3rd Cir. 1970), the Court in a prosecution for rape found that the information, undisclosed at voir dire, that one of the juror's sisters had been the victim of forcible rape and murder six years before "created a substantial possibility" that the juror "was not capable of objective determination of the facts of the case" and reversed the conviction pursuant to its "broad powers of supervision over the administration of crim-

inal justice", even though the court did not think the incident "reached constitutional proportions under a Sixth Amendment argument." *Cf. Mares v. United States*, 383 F.2d 811 (10th Cir. 1967), *cert. denied* 390 U.S. 961, 88 S.Ct. 1060, 19 L.Ed.2d 1157 (1968) (holding that a showing of "a possibility of prejudice" is not enough.)

In *United States ex rel. Devita v. McCorkle, supra*, the Court reversed and remanded with instructions to issue a writ of habeas corpus granting a new trial in a murder-robbery case because one of the jurors had been robbed in a similar manner and in the same vicinity seven months earlier, and made a nightly trip with a police escort to deposit business receipts in a bank. At one point in his summation, the prosecutor said to the jury (248 F.2d at 4):

"Why, they would stick you up, Mr. Juror No. 6, and you Mrs. Garrabrant, and you, Mr. George . . . ."

The Court added (248 F.2d at 4):

"After that amazing, violent assertion to the jury by the prosecutor, vividly reminding Kuhnle [the juror in question] of his own ordeal, how could the latter have functioned other than short of the constitutional standard of impartiality."

█ Therefore, the first inquiry in regard to the Wander and Reddington motions for new trial is whether the experience of Mrs. Mullinary with respect to her sons' arrests, wholly apart from what transpired at voir dire, affected her attitude in such a way as to amount to prejudice. Or, as the Court in *Taylor v. United States*, 386 F.Supp. 132, 140 (E.D.Pa.1974), *aff'd* 521 F.2d 1399 (3rd Cir. 1975), put it, were Mrs. Mullinary's experiences of such a type that even though she "may declare [s]he feels no prejudice in the case", that "general persons in a similar situation would feel prejudice." As appears hereafter, we do not so find.

Under existing case law, circumstances surrounding voir dire may also indicate a lack of objectivity. In *United States ex rel. Devita v. McCorkle, supra*, the juror denied that he knew "any of the State's officers or

personnel" even though he knew some Newark police officers and had been questioned by Newark detectives, and the New Jersey Supreme Court concluded the juror had failed to understand that the question included employees of the City of Newark. However, when the same juror sat silent as other panel members were asked whether they had ever been robbed or were acquainted with law enforcement personnel—local, state and federal—and several panel members mentioned such previous experiences and were excused, there was then a deliberate concealment of information that the panel had been asked to disclose. The Court of Appeals commented on *McCorkle* in a later case as follows:

"The obvious conclusion is that an individual whose desire to be a juror is so great as to cause him to conceal relevant information on voir dire must certainly be incapable of objectivity."

*United States v. Poole, supra,* at 1083.

In *Jackson v. United States,* 129 U.S.App. D.C. 392, 395 F.2d 615 (1968), the jurors on a panel for a case in which a husband was charged with murdering his wife were asked generally whether there was "any reason" why they could not "render a fair and impartial verdict." There was no response. It was later revealed that one of the jurors had had an affair with the victim some six months before the trial. The Court reversed the conviction on grounds that the non-disclosure showed the juror lacked the necessary objectivity, which is defined in Webster's Third New International Dictionary as "independent of what is personal or private in our apprehension and feelings".

In *Brown v. United States,* 356 F.2d 230, 232 (10th Cir. 1966), the panel in a murder case was asked whether "anyone in their immediate family" had ever been the victim of an attack upon their person; there was no response. In fact, the brother of one juror had been murdered some years before. The Court, in the absence of a contention of "actual bias", said the issue was whether the circumstances "compel an imputation of inherent bias to the juror as a matter of law." It found no intentional non-disclosure as the term "immediate family" was ambiguous.

In regard to the Wander-Reddington voir dire, there can be no finding that Mrs. Mullinary deliberately answered any of the questions she was asked falsely or incompletely. We further find that she did not deliberately conceal anything that she knew or should have known from the tenor of the questions was relevant to the state of mind of a juror and of interest to the Court and counsel at trial.[5] The facts, as we find them, do not approach being as egregious as those in the previously discussed cases. It goes too far to urge that a layman, who did not understand the bail-bond process, would necessarily see the relevance of the arrest of a relative to the prosecution of a bondsman as readily as he or she could be expected to appreciate the relevance of prior experience as a victim of the same type of crime. Thus, there are no grounds for finding a lack of objectivity on Mrs. Mullinary's part.

## V. CONCLUSION

The crux of this matter lies, we believe, in the statement by defense counsel that "[w]hen evidence discloses that a juror has failed properly to answer questions propounded during voir dire, a new trial is warranted if that evidence demonstrates either that such juror was biased or that

---

5. In *Virgin Islands v. Bodle,* 427 F.2d 532 (3rd Cir. 1970), the Court based its decision on the "substantial possibility" that the juror was biased, and said:

"Although no questions were put specifically to him, there were several questions asked of the veniremen generally that were intended to elicit information as to possible bias or prejudice on the part of any juror for the crime of rape."

427 F.2d at 534.

The Court in *United States ex rel. Devita v. McCorkle,* 248 F.2d 1 (3rd Cir. 1957), *cert. denied* 355 U.S. 873, 78 S.Ct. 121, 2 L.Ed.2d 77 (1952), also stressed that the juror heard the panel asked repeatedly to frankly disclose any possible source of prejudice.

Wander was prejudiced because the juror, by intentionally and knowingly failing to disclose information material and relevant to Wander's exercise of peremptory challenges, has deprived him of his right to exercise such challenges intelligently in aid of the fairness of his trial." Citing *Frazier v. United States*, 335 U.S. 497, 505, 69 S.Ct. 201, 93 L.Ed. 187 (1948). Counsel points to the oft used definition from *United States v. Wood*, 299 U.S. 123, 150, 57 S.Ct. 177, 187, 81 L.Ed. 78 (1936), that bias is "an elusive condition of the mind" but argues it is present when "for whatever reason, a juror is unable to pass impartially on the evidence deduced at trial." Also cited is the leading case of *United States ex rel. Devita v. McCorkle, supra*. As was stated by defense counsel, "the touchstone of analysis is the Sixth Amendment guarantee that every accused have a trial by an impartial jury."

At this point it is necessary that we comment on Juror Mullinary's testimony. The Court observed that she answered questions forthrightly, without any hesitation or purpose of evasion, although the matters inquired into were of an extremely personal nature. Our conclusion from her testimony is that at the time of jury selection when the questions were asked and her answers given, she was not in any way conscious that her answers were not the whole truth, nor was she subject to the type of bias to which the courts have spoken in the grant of a new trial. There is no evidence whatsoever on which this Court can put reliance that she had heard any rumors that "Wander was a shady character", or that she was aware in any way that her sons were suspicious that their cases had been handled through any "fix". If it appeared that Juror Mullinary was aware of her sons' feelings at all, this case would be in a different posture. She forthrightly stated that she was not partial in any way against these Defendants, and knew nothing about them. The best proof of non-bias is the jury's verdict of "not guilty" as to those counts involving Currie's trip to settle her own case, which were only marginally related to the extortion scheme.

Defendants then argue that a new trial is warranted even if Louis and Robert's affidavits support only the lesser conclusion that Wander was prejudiced in the exercise of his peremptory challenges. They say that prejudice is presumed if a venireman's "purposefully incorrect answer or . . . deliberate concealment" of information interferes with the exercise of peremptory challenges, citing *Ryan v. United States*, 89 U.S.App.D.C. 328, 331, 191 F.2d 779, 782 (1951). Here again, we find that there was no purposefully incorrect answer or deliberate concealment. Juror Mullinary admitted she knew her sons had been arrested, but knew nothing of the circumstances of their release, or that they had in any way been involved with bondsmen or these Defendants.

For the above stated reasons, an appropriate Order will be entered denying the Defendants' Motions for New Trial.