[Civ. No. 1864. Fifth Dist. Sept. 26, 1974.]

STEPHEN C. HELSLEY, Plaintiff and Appellant, v.
COUNTY OF KERN et al., Defendants and Respondents.

## COUNSEL

Wild, Christensen, Carter & Hamlin, Robert G. Carter and James H. Christiansen for Plaintiff and Appellant.

Borton, Petrini, Conron, Wetteroth, Hitchcock, Werdel & Kuhs, Richard E. Hitchcock and George F. Martin for Defendants and Respondents.

## OPINION

GARGANO, Acting P. J.—Appellant, Stephen Helsley, is an undercover agent for the Bureau of Narcotics of the State of California. He brought this action in the court below against respondents, the County of Kern and Kenneth Lisenbee, a deputy sheriff employed in the sheriff's office of that county, to recover damages for personal injuries resulting from a gunshot wound sustained while appellant and Lisenbee were engaged in police business; appellant alleged that the injury was caused by the negligence of respondent Lisenbee.

After jury trial, the jury returned a verdict in favor of respondents, and appellant has appealed from the judgment entered on the verdict. The court instructed the jury on proximate cause, negligence and contributory negligence, and the essence of appellant's appeal is that the evidence shows, as a matter of law, that Lisenbee was negligent, that Lisenbee's negligence was the proximate cause of appellant's injury, that appellant was not contributorially negligent and that even if appellant was contributorially negligent, his contributory negligence was not a legal or proximate cause of the injury.

The facts, when viewed in the light most favorable to respondents, are these:

On the morning of January 11, 1970, a meeting was held at the sheriff's office in Kern County to formulate plans for a police-buy of an ounce and a half of heroin for $675 from a suspected heroin dealer named Billy Lee Howard; present at the meeting were appellant, Robert Pizzo and Tom Carl of the State Bureau of Narcotics, Lieutenant Anderson and Deputy Sheriff Lisenbee of the Kern County Sheriff's office, and William Manly, a police informant. Appellant had $1,000 in marked $20 bills in his possession, and he was going to use part of his money to purchase the contra-

band; he had been instructed by his superiors to keep as much of the money as possible because they did not want the entire $1,000 tied up in evidence.

At approximately 1:30 a.m., appellant and Manly went to a service station in the Oildale area of Bakersfield where the informant called Howard from a pay telephone. A few minutes later, the suspect arrived at the station and in turn telephoned his supplier. He told the undercover men that there were problems and asked them to meet him at the Oildale service station at 3 a.m. At 3 a.m., Howard said that the supplier was not willing to consummate a transaction at that time of the morning and that appellant and Manly would have to wait until 9 a.m.

At 9 a.m., Manly telephoned Howard and was informed to call back in a half an hour. Then, when the informant called again, he was told to return to the service station in Oildale. At the station, Howard said that the transaction would be consummated in another area and instructed appellant and Manly to follow him in their automobile. A few minutes later Howard stopped his vehicle and informed the undercover men that he believed that they were being followed by the police. He instructed appellant and Manly to go to a Seven-Eleven store that was in the area and explained that the transaction would take place there; the information was radioed to the other officers who were following in separate vehicles.

At the Seven-Eleven store, Lieutenant Anderson and Agent Pizzo took positions outside of the store where Howard could not see them; Deputy Lisenbee and Agent Carl took positions inside of the store; Lisenbee stood behind a cash register and various posters on the front windows; Carl took a position at the other side of the front part of the store. It had been agreed that the buy would take place in the parking area in front of the store and that when appellant wished for the other officers to come out and make the arrest he would signal them by running his hand through his hair.

At 11:30 a.m., Howard arrived in his 1963 Cadillac; he drove his car to the opposite side of the street and parked it near the curb with the driver's side facing the front of the store; he left the engine running. Then, appellant walked across the street and up to the automobile on the passenger side; the door was open and Howard said, "Let's go up the street and do the deal." Appellant replied, "No, let's do it here," and got into the vehicle.

In the automobile, Howard handed appellant a condum containing a brownish powder which appeared to be heroin. A small scale was located

on the floor of the car, and appellant placed the condum on the scale; it weighed two ounces; earlier, Howard told appellant that he would try to get two ounces of heroin for the price of $1,200, and appellant agreed to buy it even though he did not have sufficient money to pay for that amount; appellant testified that he wanted to put as much heroin as possible out of circulation and that it was not unusual to have insufficient money to cover the sale when the arrest was to be made on a prearranged signal.

After weighing the condum, appellant placed it in his shirt pocket and then handed Howard a packet of bills containing $500. As Howard was counting the bills, appellant grabbed for the automobile keys with his left hand, turned off the engine and pulled the keys out of the ignition; with the remainder of the money in his right hand, appellant opened the passenger side door, got out of the car and ran toward a nearby tree.

As appellant approached the tree, he heard a firearm discharge and felt his left arm go limp. Appellant took a couple more steps, spun around, dropped the cash and keys and drew his firearm; he fell on the lawn and took careful aim at the suspect who was crouched behind the left rear portion of the Cadillac; the two men exchanged shots, each firing eight rounds. Appellant felt weak and put his hand and gun on the ground; he heard another report from a firearm and felt something strike his left side.

Agent Carl observed the activity which was taking place in the automobile from his vantage point in the store; he saw appellant reach over toward the suspect and observed the car's windshield wipers come to a stop; the sky was overcast, and it was misty. Carl said, "Let's go," and he and Deputy Lisenbee ran out of the front of the store. Lisenbee ran to a nearby post and took out his .38 revolver; the post was located at the front of the parking area and across the street from the parked Cadillac. The deputy saw a man running from the automobile and saw him fall; he fired three shots at the prostrate man; then Lisenbee walked across the street and discovered that appellant was the man who was lying on the ground. It subsequently was determined that a bullet fired from Lisenbee's gun had lodged in appellant's back next to the spinal column, causing permanent and substantial loss of the use of appellant's left leg.

At the trial, appellant explained that in his opinion the only signal he could give to alert his surveillance that it was time to make the arrest was to leave the automobile; his plan was to stop the engine of the vehicle to prevent Howard from driving off and to avoid the danger involved in a high-speed pursuit. Appellant testified that he did not draw his .45 automatic in an attempt to arrest the suspect because he was sitting on the gun

and there was no way to remove it; he stated that he knew that Howard was armed and that it was poor police procedure for an undercover agent to attempt an arrest by himself; heroin "pushers" are prone to suspect that they are being hijacked instead of arrested.

Respondent Lisenbee testified that as he came out of the front door of the store, he saw an individual run from the car and fall to the ground. Respondent stated that he reacted to the situation and ran to a nearby post, took out his .38 revolver, and after taking careful aim fired three shots at the person lying on the ground *with the intent to kill.* Lisenbee said that he knew what appellant looked like and what he was wearing. He also said that he knew that Howard had red hair and a red beard and that the suspect's clothing was different than appellant's. Respondent admitted that while the sky was overcast, it was clear at ground level and that he had no difficulty seeing across the street.

This is not a case where a police officer who was engaged in a hazardous undertaking was struck, accidentally, by a stray bullet fired from the gun of a fellow-officer. On the contrary, in this case a trained policeman deliberately aimed his gun at a fellow-officer who was lying on the ground and, under the mistaken belief that the prostrate man was a dangerous criminal, fired the gun with the intent to kill. The pivotal question, therefore, is whether Lisenbee's deliberate act was an act of negligence *as a matter of law*; it is settled beyond dispute that whether certain conduct amounts to negligence is an issue of fact and that a jury's determination on the issue cannot ". . . be disturbed upon appeal if the record discloses any substantial evidence or reasonable inferences in support thereof." (*Pierce* v. *Black,* 131 Cal.App.2d 521, 525 [280 P.2d 913].)

■ We have concluded that Deputy Lisenbee was negligent as a matter of law. As the deputy came running out of the store, appellant emerged from the passenger side of the suspect's Cadillac and ran toward a tree located on the lawn of a residence in an area behind and to the right of the parked vehicle. At the same time, the suspect got out of the driver's side of the automobile, took a position behind the left rear fender and fired his gun at the fleeing narcotic agent, striking him in the left arm. As these events were transpiring, respondent stationed himself behind a pole across the street from the parked Cadillac and *perpendicular to the car's left rear fender*; Lisenbee knew what appellant looked like and how he was dressed; he also knew that appellant had entered on the right side of the vehicle and should have known that it was more probable than not that it was appellant who was running from that side of the car. If the officer had looked slightly to his left, he would have seen Howard crouched

at the rear of the car and because the suspect was in plain view would have recognized him immediately by his red hair, red beard and clothing. Clearly, had Lisenbee paused for a moment to reflect on the situation instead of deliberately aiming and firing his gun at the man who was lying on the ground with the intent to kill, he would have known that the fallen man was the undercover agent.[1]

Respondents argue that Lisenbee reacted to an unusual and unexpected situation and that his conduct must be judged in light of the confusion and excitement of the moment. They suggest that the deputy sheriff was in imminent danger when he shot at the undercover agent and that he was trying to protect his own life and the lives of others.

It is true that Lisenbee was acting in an emergency situation when he shot appellant. But, the fact remains that he was an experienced and trained police officer conditioned to react promptly and properly to emergency situations. It also is true, undoubtedly, that the deputy was trying to protect his own life and the lives of others when he fired the shot. Nevertheless, he knew that a fellow-officer was in the zone of danger, and he testified that the fallen man only was firing in the direction of the vehicle. In our view, it was gross negligence for respondent to aim and fire his gun, deliberately, at the man lying on the ground without being reasonably certain that the man he was shooting at was not the undercover agent. (See *Holland* v. *Mayes,* 155 Fla. 129 [19 So.2d 709].)

■ We consider next the issue of contributory negligence.

Respondents argue that appellant's action in jumping out of the car exposed him to the risk of being shot, not only by the heroin pusher but by a member of appellant's surveillance. They point to the fact that appellant could have drawn his own weapon and advised Howard that he was a police officer and placed the suspect under arrest; respondents insist that because appellant had a choice, the question as to whether he was negligent in choosing the course of action he elected to follow was a question of fact to be determined by the jury.

Appellant was engaged in a hazardous activity, and the change in circumstances forced him to depart from the initial plan. As we have indicated, the plan called for the buy to be made in the parking area of the Seven-Eleven store within proximity of the other officers. However, Howard did not drive into the parking area but instead parked his car across the street next to the curb; he also told appellant that he wanted to go elsewhere. Then, when the undercover agent insisted on conducting the transaction

---

[1]See Appendix.

there, the suspect cautiously left the car's engine running, apparently to insure a fast getaway. As a consequence, appellant was faced with three possible choices. He could have proceeded with the original plan and signaled his fellow-officers by running his hand through his hair, or he could have drawn his gun and, after announcing he was a police officer, placed appellant under arrest, or he could have grabbed the keys from the ignition and jumped out of the vehicle as he did.

Since the other officers were a considerable distance away, it seems unlikely that they would have been able to see the planned signal from their vantage points in the store. Appellant testified that in his opinion the only signal that he could give the surveillance to alert them to make the arrest was for him to leave the vehicle. He indicated also that he was fearful of becoming involved in a dangerous high-speed chase. Appellant testified that he did not draw his gun and try to arrest Howard because he was sitting on his gun and could not reach it quickly; he explained that he knew that the suspect was armed and that it would have been poor police procedure for the undercover agent to try to make the arrest by himself. It seems clear to us that unlike Deputy Lisenbee, appellant, who was confronted with sudden peril, had several possible choices, each fraught with its own peculiar dangers, and that he considered each choice before making his decision; we may not now use hindsight to declare that he was negligent in choosing the course of action he elected to follow. It is the rule that " '. . . where a situation requires an immediate choice between alternative courses of conduct, negligence may not be inferred from an unwise choice, if a reasonable man, under similar circumstances, would choose similarly.' " (*Kirk* v. *Los Angeles Ry. Corp.,* 26 Cal.2d 833, 841 [161 P.2d 673, 164 A.L.R. 1]; *Markewych* v. *Altshules,* 255 Cal.App.2d 642, 646 [63 Cal. Rptr. 335]; see *County of Alameda* v. *Tieslau,* 44 Cal.App. 332, 336 [186 P. 398].)

■ Even if we were to assume that there was substantial evidence for the jury to find that appellant acted rashly in jumping out of the car, his action in doing so was not the legal cause of his injury. Appellant knew or should have known that he was running the risk of being shot by the heroin "pusher." He also could have foreseen the possibility of being hit accidentally by a stray bullet fired by a fellow-officer in the heat of the excitement. But Lisenbee's conduct bordered on gross negligence, and it would be unreasonable to believe that appellant should have foreseen that degree of carelessness on the part of a trained police officer. (*Celli* v. *Sports Car Club of America, Inc.,* 29 Cal.App.3d 511, 523 [105 Cal.Rptr. 904]; 35 Cal.Jur.2d, Negligence, § 232, p. 765.) In fact, it stretches the imagination to believe that appellant could have anticipated the risk of being deliber-

ately shot by an experienced law enforcement officer who was a member of appellant's own surveillance, particularly when appellant had good cause to believe that the officer (1) knew that the undercover agent was seated on the right side of the vehicle, the side from which appellant planned to emerge, (2) knew what appellant looked like and how he was dressed, and (3) knew that the suspect had red hair and a red beard.

It is the rule that a plaintiff's contributory negligence does not necessarily bar recovery for damages caused by another's negligence even though there is a causal connection between the contributory negligence and the injury unless the injury results from the particular risk to which the plaintiff's conduct has exposed him. (*Asplund* v. *Driskell,* 225 Cal.App.2d 705, 716 [37 Cal.Rptr. 652]; Prosser, Law of Torts (3d ed.) § 64, p. 432.) As is said in comment (c) to section 468 of the Restatement Second of Torts: "There is a difference to be noted between negligence and contributory negligence. Where the negligence of a defendant creates a risk of a particular harm, occurring in a particular manner, and the same harm is in fact brought about in another manner, through the operation of some intervening force which was not one of the hazards making up the original risk, the defendant normally is not relieved of responsibility by the intervention of the force, and is liable for the harm. (See § 442A and Comments.) But where the negligence of the plaintiff creates a risk of a particular harm to him, occurring in a particular manner, and the same harm is in fact brought about by the intervention of a force which was not one of the original hazards, the plaintiff is not barred from recovery. This difference is to be attributed to the more restrictive attitude of the courts toward contributory negligence, as compared with negligence, and their tendency to confine it within somewhat narrower limits."

The judgment is reversed.

Franson, J., and Thompson, J.,* concurred.

A petition for a rehearing was denied October 25, 1974, and respondents' petition for a hearing by the Supreme Court was denied December 11, 1974. Clark, J., and Richardson, J., were of the opinion that the petition should be granted.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.