Walker PREECE, Appellant,

v.

Don HARLESS, Appellee.

Court of Appeals of Kentucky.

June 3, 1983.

Discretionary Review Denied
Feb. 13, 1984.

Ransome C. Porter, Inez, for appellant.

Eugene C. Rice, Rice & Frazier, Paintsville, for appellee.

Before HOWERTON, MILLER and WILHOIT, JJ.

MILLER, Judge.

The Martin Circuit Court directed a verdict against the plaintiff in a case involving personal injuries allegedly sustained by the plaintiff when he was backed over by a truck driven by the defendant. The directed verdict was based upon plaintiff's contributory negligence and was entered at the close of plaintiff's case. Plaintiff brings this appeal.

The scenario which led to Walker Preece's accident began early on Sunday, February 22, 1981, in the hollows of Davella in Martin County, Kentucky. That morning, about 9 o'clock, Don Harless arrived at Walker Preece's trailer. He was driving his truck. Don appeared to be intoxicated

when he arrived, and he became more inebriated as the day wore on. There was testimony that Don had been "on a drunk" since Thanksgiving.

About mid-morning Don talked Walker into riding with him to a grocery store to get some orange juice to mix with a half gallon of gin Don obtained from a "boy" visiting Walker's daughter. Don drove on the trip to the grocery store. The trip to and from the store was uneventful. Don whiled away the afternoon drinking; Walker drank only three drinks during the day, according to his testimony.

Sometime in the late afternoon, Walker told his wife to begin preparing supper. Don said he wanted to get a friend to come and share the evening meal with them. Walker told Don he would go with him if Don would allow Walker to do the driving. Walker testified that he drove to the friend's trailer, but Don insisted on driving back to Walker's after they found the friend was not at home. The facts that led up to the fateful trip and Don's ultimate driving are best described by Walker's testimony:

Q. Now, what time does this take you up to?

A. Well, at the time we got back from the store and stayed there about all day.

Q. So he stayed then and continued on with you for what time?

A. Well, the old woman had laid down in there to rest, and I went in there and I told her, I said, "I am getting hungry, get up and get some supper." And she got up and started cooking. And Don said he wanted to go down and get Alice Goble, said his wife left him and he didn't have no cook, and he liked a good meal, and I didn't want to go, and he just kept on, and I said, well, if you will go down there and back and let me drive, I will go with you, and the very words he said, "Hell, drive." And when we got down there, he took the truck away from me.

On the way home, as they entered a fork in the road, Don yelled some harassing words at a red and white blazer truck coming toward them. An unidentified man in the approaching truck jumped out swinging a golf club. Seeing that Don was now slumped over the wheel, Walker got out of the truck to try to make peace. Before Walker could speak, he was hit about the head with the golf club. The beating was substantial. At this point, Walker took out a knife and threatened the man. The man retreated toward his truck. Next, Jimmy Fraley, who lives some 75 feet from where the altercation was taking place, heard the commotion and began to walk toward the two trucks. The unidentified men drove off, and Mr. Fraley turned to home. The whole incident was best described by Walker as follows:

Q. What took place then? Who was driving at that point?

A. Don. Well, we met this red and white blazer, white top and red on the bottom. And Don mumbled something to him, I don't know, he cussed him, but I will be john if I could understand what he called him.

Q. Did he pass, actually pass side by side, in the vehicles?

A. Well, they had met-like, and Don just about hit him, but there ain't no stop sign there at either place, but I would say the Wolf Creek side, a bunch of coal tractors, I would say they would have the right of way, and Don didn't stop, he about run into the boy.

Q. And then what took place? What did those people do?

A. He come back just flying and stopped us, and jumped out with a golf club in his hand, when he jumped out of the truck.

Q. Did he say anything to you?

A. Yeah, he was cussing and cutting the *awfullest* shine ever was, wanting Don to get out. And Don's glasses kindly fell down on his eyes, and had a partial plate, and it fell about halfway out, and he turned around and looked around at me and his eyes got about the size of quarters and he just keeled over on the wheel there as dead as a four o'clock.

Q. Did they approach you all on towards the truck you were in? Did you see the guy get out?

A. No, he stood back there with that golf club jumping up and down and walking around, and I got out, intending not to pay no attention to Don, and I no more than stepped back at the end of the truck—

Q. So you got out then and said what to them basically?

A. I got out and started towards the back of the—

Q. You got out now and said what to them?

A. I got out and started back in toward the back end of the truck telling him to pay no attention to Don, he was drunk and had been all day, and he didn't give me time hardly to open my mouth till he knocked me down with a golf club.

Q. Didn't give you time to what now?

A. He didn't give me time to tell him what I was aiming to tell him; he just swung that golf club and knocked me down.

Q. Well, where did he hit you at with the golf club?

A. He hit me around the head; the side of the head.

Q. Then did you proceed to try to talk to him, or what took place then?

A. I tried to raise up and when I raised up, he knocked me right back down. I seen that wasn't going to work, and so I got up, and every time he would hit me, he would run around behind his blazer, I don't know what made him run. Every time he would swing that golf club, he would just fly back behind that blazer. And the last time he done that, I got up and went around on the driver's side, the front headlight, and put my arms up on the hood, and I pulled my knife out.

Q. Were you proceeding to talk to him at this time?

A. Now, you couldn't talk to him. He was a crazy fellow, Buddy.

Q. Then what took place right at this time; did he hit you any more after them two licks?

A. He knocked me down two or three times, I can remember that time he knocked me down, he hit me so fast.

Q. Then you got up and went over toward them to them, and what was said then, I mean, when you went to their blazer? Did you say anything to them? What did you do then?

A. I tried to tell him not to pay no attention to Don, he was drunk, but he didn't listen to me; he just felled me with that golf club, you could hear the wind blowing kind of.

Q. So some licks never hit you actually?

A. No.

Q. Did any of those licks hit you anywhere in the hip region or the legs that would have caused the injury that you got?

A. No, sir.

Q. Were you hit at all? Did they hit you at all—were they hitting down at the bottom of you?

A. No, they were trying to hit my head all the time, he was hitting toward my head.

Q. He was trying to lay you out then?

A. Yeah.

Q. Then what took place at that point? When did Mr. Fraley come?

A. Well, I got in front of the truck, and got my knife out, and I said, "Now, if you are coming around that truck, I will throw this knife square through you", so that's when he got his golf club and started backing towards his blazer, and that's when Jimmy come out there and hollered and wanted to know what was going on down there, and he said, "We started it and we are leaving."

There is conflicting testimony as to what happened next. At trial, Walker testified that as he got back in the truck he noticed his cigarettes had fallen out of his shirt pocket. Before getting out to look for them, he reached over and turned off the ignition. In pre-trial deposition, Walker said that the engine was racing when he got out and that it was not turned off

before he got out. Walker was impeached at trial with the statement in his deposition.

As Walker bent over to hunt for his cigarettes, the truck lurched backwards hitting him. The truck then went forward dragging him in that direction. At trial he testified that he heard Don start the truck up just before he was hit. Walker crawled around to the passenger side of the truck and climbed in.

Walker was apparently driven to a local physician's residence, Dr. Goble, by Don. Dr. Goble's son, Tim, drove Walker home where he was put in his station wagon and driven by his wife to Prestonsburg Highlands Regional Medical Center. From there Walker was taken by ambulance to Huntington Hospital where he was admitted and remained for six days under the care of Dr. Imre Szendi-Horvath, an orthopedic surgeon.

█ Upon the foregoing facts the trial court directed a verdict against plaintiff at the close of his evidence, citing *Harlow v. Connelly*, Ky.App., 548 S.W.2d 143 (1977), and *Isaac v. Allen*, Ky., 429 S.W.2d 37 (1968). Both *Harlow* and *Isaac* involved cases of injuries to plaintiff while actually riding with a known drunk driver. These cases reflect a well-established rule of law that one riding with a driver known to be intoxicated cannot withstand a motion for a directed verdict and have his conduct weighed by the jury. In considering the question of directed verdict the court is bound to draw all fair and reasonable inferences in favor of the party opposing the motion. *See Spivey v. Sheeler*, Ky., 514 S.W.2d 667 (1974). After such indulgence by the court, a directed verdict will then be granted only if the court concludes that reasonable minds would not differ upon the issue. *See Perry v. Ernest R. Hamilton Associates, Inc.*, Ky., 485 S.W.2d 505 (1972), and *Life & Casualty Insurance Company of Tennessee v. Jones*, Ky., 436 S.W.2d 75 (1968).

Appellant contends that his case does not fall within the *Harlow-Isaac* rule for reason that he was not a passenger at the time of the accident. The trial judge extended the *Harlow-Isaac* rule to include a passenger who had just "alighted" but showed no intent to abandon the trip. The trial judge stated:

> If this man had gotten out of the truck and said, "I am leaving, I am getting away from here, I am not going to ride with a drunk man" and the truck ran over him, then there would be a case, but this man got out to get his cigarettes and his lighter, and was going to get back in the truck and was going to ride with the drunk, and in this case, I have no alternative but to sustain your motion. You can take it up on appeal, you have that right, of course, but I have no alternative.

█ As indicated by the *Isaac* court, these cases are very troublesome. Courts are often divided as to whether or not they should be submitted to the jury or decided by the court on motion for directed verdict. The fundamental principle of law is that unless the actor is a child or an insane person, he is held to the standard of conduct of a reasonable man, under like circumstances, and this applies to the plaintiff as to the standard he must maintain for his own protection. *Restatement (Second) of Law of Torts* § 464 (1966). There is no exception in the case of persons who are voluntarily intoxicated, they too must conform to the standard of a reasonable man. 57 Am.Jur.2d *Negligence* § 356 (1971).

█ Our attention is drawn to the *Restatement (Second) of Law of Torts* § 468 (1966), which provides that although a plaintiff has failed to exercise reasonable care for his own safety his recovery is not barred unless his harm results from one of the hazards which make his conduct negligent. We believe the hazard incurred by a passenger of a drunk driver ordinarily consists of wrecking the vehicle. The hazard would not ordinarily involve being struck by the vehicle. Therefore, we believe that Walker's riding with Don, while drunk, was not a subjection to the risk which ultimately caused his harm. It can well be argued to the contrary, but because of the divisiveness over the present rule which is limited

to passengers, we do not extend the rule to former passengers at this time. We are further persuaded in our decision by the evidence that appellee Don Harless appeared to be "passed out" and slumped over the steering wheel at the time Walker Preece left the vehicle and went behind it to recover his cigarettes. One could hardly expect him to operate the vehicle in this condition.

We do not fully comprehend the reasoning of the trial judge in resting his decision upon the fact that Walker intended to continue the journey. Intent generally has no place in the law of negligence. It is generally not a circumstance to be considered. 57 Am.Jur.2d *Negligence* § 13 (1971).

For the foregoing reasons the judgment of the trial court is reversed and remanded for further proceeding.

All concur.