**Philip A. WEEDA, Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

No. 83–366.

District of Columbia Court of Appeals.

Argued Sept. 13, 1984.

Decided March 6, 1987.

J. Joseph Barse, with whom Robert E. Higdon, Washington, D.C., was on brief, for appellant.

Richard B. Nettler, Asst. Corp. Counsel at the time the brief was filed, with whom Inez Smith Reid, Corp. Counsel, John H. Suda, Principal Deputy Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, were on brief, for appellee. Gary S. Freeman, Asst. Corp. Counsel, Washington, D.C., also entered an appearance for appellee.

Before MACK and TERRY, Associate Judges, and REILLY, Senior Judge.

REILLY, Senior Judge:

Appellant sued the District of Columbia for a permanent physical disability allegedly caused by the negligence of its employees in extricating him from the wreckage of an automobile. After a lengthy trial, the jury found that such injury was not caused by the District personnel. The court then entered judgment for the District. Following a denial of a motion for a new trial, appellant noted an appeal and now contends, *inter alia,* that (1) the jury's finding on causation was contrary to the overwhelming weight of the evidence, and (2) the admission of testimony showing that the occupants of the car were intoxicated at the time of the automobile accident was not only error but so prejudicial that appellant was deprived of a fair trial. Discerning no reversible error, we affirm.

**I**

The evidence in the ten day trial may be summarized as follows:

Early one evening in October 1979, appellant, a college student, and two other young friends, John Gannon and Robert Langley, drove in Gannon's car from suburban Maryland into the city. After going to two different taverns and drinking substantial amounts of beer, they returned to Gannon's car to start back for home at about 1:30 a.m. As Gannon drove east on Florida Avenue, N.W., at high speed, he attempted to make an illegal left turn at the intersection of Florida and Connecticut Avenues and lost control of the car. It skidded, smashed against a metal traffic pole, flipped over on its side and came to rest leaning against the pole. Appellant, who had been sitting in back, was wedged between the front and back seats, his legs pointing upwards and his head lolling outside the left rear window just above the pavement. The driver, Gannon, was also trapped, his head hanging out the window on the same side of car. Langley, who was next to him, managed to extricate himself by climbing out on the upper side.

Soon thereafter, the city Fire Department dispatched fire trucks and two emergency ambulance crews to the scene of the accident. Wayne Paxton, an emergency medical technician and crewman in charge of the first ambulance to arrive, found appellant conscious and moving about. Despite the precarious position of the car, which limited access to appellant and cre-

ated the risk of crushing his head, Paxton was able to apply a cervical collar to appellant's neck. When the tilting car was eventually stabilized by blocks placed under it by firemen, who then removed the roof, appellant was lifted out, placed on a long spine board and carried to a second ambulance, where an examination by Peter Podell, a paramedic, revealed that appellant was paralyzed, unable to move his arms or legs.

Subsequent examination at the hospital disclosed fractures of the vertebrae. It was also discovered that the cause of the paralysis was an injury to the spinal cord. Despite prolonged treatments, including surgery, appellant's quadriplegic condition has not been corrected. He remains permanently crippled.

In the suit against the District, appellant conceded that the vertebral fractures, *i.e.*, a broken neck, were incurred by the impact of the car against the traffic pole, but attributed the spinal cord injury to the asserted negligence of the rescue squad in handling him after the accident occurred. It was appellant's contention at trial that when the squad arrived, his arms and legs were still functioning, and that the crippling damage to the spinal cord could have been averted had the rescue team taken the precaution of strapping a short spinal board to his back, before removing him from the wrecked automobile.[1]

To support this theory, appellant called a paramedic, Peter Podell, to the stand. Podell was in the second ambulance to arrive, a vehicle driven by another paramedic, Robert Hernandez. He testified that he examined appellant, then still trapped inside the car, and in doing so, extended his hand and asked appellant to squeeze it.

Appellant, he said, squeezed his hand "with both of his hands, one at a time." Podell also asked appellant to move his legs, and appellant complied. According to Podell, these responses indicated that appellant had full sensory-motor capability and that his central nervous system was intact. Nevertheless, suspecting that appellant had sustained a back injury, Podell decided that appellant's body should be immobilized by affixing a short spine board. He went back to his ambulance to pick up such a device, but was blocked on his return by firemen who had surrounded the car.

After the roof of the car had been pulled back, Podell testified that he watched the removal of appellant from the wreckage without the use of the short spinal board or any back support, and saw appellant's body "rotate" and his head move a "significant number of inches." Appellant was then placed on a long spine board and deposited in the Podell ambulance. Although that board did provide some support, Podell said,

> There was no support to the lateral, to the side of the head, to prevent a twisting motion with either of the two accepted pieces of apparatus to use for that purpose, nor was the head secured to the board with any of the normal methods for doing so.

It was after appellant was in the ambulance that Podell reported that the injured man could no longer move his limbs.

Appellant also called two expert witnesses: Dr. Harvey Ammerman, a neurosurgeon, and Dr. Roger Halterman, a specialist in emergency medicine. Dr. Ammerman, asked to assume the facts related by Podell, testified that it was "more medically probable that something occurred be-

---

1. Such a precaution is set forth in the standard instructions of the D.C. Emergency Ambulance Force, which provides in pertinent part:

    Care of Spinal Injuries: Proper initial care for a spinal fracture may save thousands of hours of nursing care and years of disability. The EMT, emergency medical technician, has the opportunity to prevent paralysis or even death. The emergency care of spinal injuries follows the same rules as for all other major injuries.... Most important, splint the patient before moving him. Effective splinting

markedly relieves the patient's pain and stabilizes the injured spine so that nerve damage from the movement of bony fragments is much less likely. While splinting an injured spine avoid abnormal or excessive motion. Be sure that the injured person is transported on a long backboard or special stretcher without bending or twisting the spine in any direction. If the head of an individual with a cervical spine fracture is allowed to move a single motion may cause paralysis or death.

tween the first and second examinations that resulted in [appellant's] becoming quadriplegic." Ammerman concluded that "something had impinged in that interval upon the spinal cord that damaged it to a degree that stopped it from functioning permanently." Dr. Halterman was also asked to assume the facts as stated by Podell, and he agreed that appellant's paralysis was attributable to something which occurred after the initial examination by Podell-specifically, "the motion allowed to occur during the extraction...."[2] Thus, the expert medical opinion supporting appellant's case rested on the assumption that Podell's testimony was true.

The bulk of the evidence the District offered was intended to prove that (1) the testimony of Podell deserved no credence and hence destroyed the foundation for the opinions of the plaintiff's medical experts; (2) the physical position of the plaintiff in the wrecked and tilted car when the paramedics arrived precluded the use of a short spinal board without exposing him to the risks of a crushed skull, if the car completely toppled over, or of aggravated injury to his back once the car was propped up; and (3) the injury to the spinal cord which caused paralysis was the result of the violent impact suffered by the plaintiff when the careening vehicle struck a light pole and thus rendered his condition irretrievable by the rescue squad.

Podell's version of what happened at the scene was contradicted in crucial respects by other witnesses who participated in the rescue operation. Paxton testified that Podell was never in close contact with the occupants of the wrecked car before it was propped up by the firemen and was not even on hand later to assist in lifting out the principal victim of the accident. This portion of his testimony was corroborated by Hernandez who was unable to recall ever seeing his ambulance mate beside the car. Paxton also underscored the virtual impossibility of attaching a short spine board to appellant's back, without having to bend his body at a time when its position was compressed inside the tilted vehicle. He averred that he was aware of the danger of an aggravating injury if appellant twisted his neck, and therefore held the latter's head in traction while he and another man extricated him.[3]

Over the strenuous objection of appellant's counsel, evidence of possible bias on Podell's part against the District was admitted. It appeared that while he was an ambulance employee, Podell received an official reprimand and a demotion stemming from two separate incidents of misconduct, unrelated to this case. At the time of the trial, Podell was working in Kansas, having quit his local job shortly after his demotion.

To establish that appellant's paralysis was attributable to the automobile accident and not to any act or omission, negligent or otherwise, by its agents, the District called as its principal expert witness Dr. Arthur Kobrine, a professor of neurological surgery at George Washington University Hospital. He was of the opinion that appellant's paralysis was due to the accident itself and would have occurred regardless of any act by the rescue team. Kobrine said that his opinion was based upon (1) a videotaped reenactment of the rescue operation, which demonstrated that there was "very little" movement of appellant's neck as he was being removed from the car; and (2) information in an "operative note" made by the surgeon at the hospital which re-

---

2. The testimony of Drs. Ammerman and Halterman was bolstered by the testimony of Dr. Donald Cooney, a rebuttal witness. Also requested to assume what Podell had testified to as fact, he came to the same conclusion that they had reached:

> The spinal cord injury had to occur between the first examination while [appellant] was in the automobile and he was able to move his extremities, between then and the second examination when he was obviously out of the car and was not able to move his arms or legs.

Dr. Cooney also attributed appellant's paralysis to inadequate stabilization. He said categorically that "if a splint had been applied, [appellant] would not have become quadriplegic."

3. Podell himself acknowledged the difficulty of application of a short board without moving the victim in some degree, and conceded that the slightest movement could cause a crippling injury. He also mentioned that he had observed appellant thrashing about after the accident.

vealed the presence of "extruded pieces of internal vertebral disc" inside appellant's spinal canal that were "squeezing" into his spinal cord. Kobrine explained that a "massive force" was necessary to extrude the disc into the spinal canal, and from this he concluded that it was the accident itself which caused both the extrusion of the disc and the "squeezing" of the disk into the spinal cord. Finally, he stated:

> [M]asses that acutely extrude into the spinal canal and squeeze into the spinal cord ... that has just undergone an injury, severe and sufficient enough to fracture [a] cervical vertebra, is in my opinion ... sufficient to cause an inevitable progression of spinal cord dysfunction which leads to quadriplegia.

This opinion, Dr. Kobrine explained, was consistent with the results of his laboratory research which revealed that a piece of vertebral disc which impinged upon the spinal cord could cause immediate paralysis or, depending on the size of the disc and the length of time it impinged upon the spinal cord, paralysis twenty, thirty, or sixty minutes afterwards.

## II

We turn now to appellant's challenge to the special finding of the jury that neither the acts nor omissions of the rescue squad employees caused appellant's paralysis. According to his brief, such finding was "so contrary to the overwhelming weight of the evidence that it cannot be allowed to stand."

■ It is well established that where a jury verdict in an action for negligence is assailed on evidentiary grounds, the test is not whether such verdict is supported by the weight of the evidence, but whether there was enough evidence-more than a mere scintilla-to enable reasonable jurors to arrive at such verdict. *See, e.g., Aqui v. Isaac,* 342 A.2d 370, 371–72 (D.C.1975), *Tan Top Cab Co. v. Shiller,* 125 A.2d 68, 69 (D.C.1956). But it is also recognized, as appellant points out, that where a motion for a new trial is pending—such a motion was filed and denied here-the trial judge has discretion to grant such motion if it appears that the verdict is contrary to the clear weight of the evidence. *Rich v. District of Columbia,* 410 A.2d 528, 534–36 (D.C.1979).

■ Assuming that this standard is the proper one for judicial review, the record here discloses no abuse of discretion in the denial of a new trial. Appellant stresses the fact that three medical specialists, Drs. Hammerman, Alterman, and Cooney were of the opinion that intervening events, not the accident itself, were the cause of the paralysis, and that only one medical specialist, Dr. Kobrine, disagreed with their conclusions. While the ratio of three-to-one may perhaps be termed "overwhelming," the mere fact that the jury accepted the opinion of a single witness does not necessarily mean that its conclusion disregarded the weight of the evidence.

Appellant's emphasis upon the unequivocal character of the conclusions stated by his expert witnesses ignores the fact that their opinions were based on the hypothesis that appellant was able to move his arms and legs immediately after the accident. But-as we have seen—this hypothesis rested on a shaky foundation. Except for Podell, no witness testified that appellant could control arm and leg motions after the car crash. Podell's testimony was contradicted not only by two other witnesses on the scene, but was of questionable belief because the compressed position of appellant's body in the wrecked car rendered impractical any restraint upon his own movements by application of a splint without unacceptable risk of immediate greater injury. As we have also noted, the jury could have deemed Podell's testimony at least in part motivated by bias.

Moreover, Dr. Kobrine's opinion was entitled to great weight as he was the only expert witness who had examined the notes of the surgeon who had operated upon appellant's spine. Appellant never called that surgeon to the stand, but instead relied upon another neurosurgeon, a rebuttal witness, for the view that the disc extrusions described by the defense expert were not severe enough to produce such a dire result as paralysis. Clearly, it was within

the province of the jury to accept or reject either one of these analyses.

Thus, there was ample evidence for the jury in arriving at its special verdict to conclude that the impact of the crash was the cause of paralysis or that the motions of appellant to dislodge himself, in the interval prior to extrication, damaged his spinal cord beyond repair. Appellant quotes *Simpson v. Logan Motor Co.,* 192 A.2d 122, 124 (D.C.1963), for the proposition "only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear." Plainly, the instant case does not fall into this category.

### III

■ When we heard argument in this case, appellant contended vigorously that testimony elicited by the District to show that he and his companions were drunk at the time of the accident was not only irrelevant, but also so prejudicial that the court committed reversible error in not granting a mistrial. The record discloses that the appellant, relying on the last clear chance doctrine, had filed a pretrial motion, asking the court to rule out any evidence concerning the circumstances preceding the automobile accident, and expressed willingness to concede that the negligence of the occupants of the car caused the crash. The District opposed the motion on the grounds, *inter alia,* that the jury was entitled to a "full factual predicate for making their decisions"; and that it proposed "a defense of contributory negligence, of which the drinking and driving is a seminal part." The court tentatively denied the motion and the trial proceeded.

On appeal, particular objection is lodged against defendant's elicited testimony of heavy beer drinking in three places (a residence and two downtown bars), the eventual intoxication of the trio, and appellant's own acquiescence to riding in a vehicle driven by a friend whom he knew was drunk and inclined in such condition to be uncautious at the wheel. He cites as error admission of testimony by Langley brought out by defense cross-examination concerning appellant's drunkenness, and Gannon's disregard of traffic regulations, and the defense being permitted to call Gannon to the stand to obtain concessions that he had been drinking so heavily that by the time he decided to drive his friends home, his vision, reflexes, and memory were impaired. Also he objects to the court's allowing a toxicologist to be called to establish the high alcoholic content in the bodies of the injured men.

Appellant makes the point, which is well taken, that evidence of contributory negligence on his part, while relevant in a suit for damages against the driver, Gannon,[4] was irrelevant to the case before the jury as the claim against the District did not attribute any blame to that defendant for the cause of the accident. In the context of the case, however, it does not appear that the testimony demonstrating the inebriated condition of appellant was completely irrelevant. For one thing, it served to bolster one aspect of Dr. Kobrine's testimony, *viz.,* his comment that excess alcohol renders the body's tissues weaker and consequently more susceptible to spinal injury. This testimony further explained appellant's "thrashing about" during rescue efforts.

Nevertheless, the court ultimately sustained appellant's irrelevancy objection. At the close of all the evidence, the court ruled that while appellant's conduct on the night of the accident was negligent, there was no factual issue for the jury to resolve with respect to this particular issue. Consequently, the court instructed the jury to disregard the evidence concerning appellant's negligence:

> You are not to concern yourself with whether the plaintiff, Philip Weeda, was intoxicated at the time of the accident. You are not to concern yourselves with whether Philip Weeda was negligent in riding as a passenger in John Gannon's

---

4. By prior stipulation of counsel, the action for damages against Gannon was to be heard and decided by the trial judge, not the jury.

automobile in the early morning hours of October 6th.

In an effort to aid the jury in its deliberations, the court submitted two special interrogatories:

1. Do you find that the employees of the District of Columbia were negligent in the treatment of the plaintiff, Philip Weeda?

2. Do you find that the alleged negligent acts or omissions of the employees of the District of Columbia proximately caused plaintiff's quadriplegia?

Thereafter the court instructed the jury that it should answer question number 1 first, then "in the event that you do [find negligence]," it should consider question number 2.

After deliberating, however, the jury, unable to reach a unanimous vote on the first interrogatory but unanimously agreed on the second, requested the court's guidance. After a bench conference between the court and counsel, it was recognized that if the unascertained answer to the second question was "no," further proceedings would be unnecessary. Once the jury revealed its answer in the negative, judgment was entered for the District.

We cannot say that the admission of testimony elicited with respect to intoxication was so prejudicial that this judgment should be reversed. *Cf., e.g., Smith v. Executive Club, Ltd.*, 458 A.2d 32 (D.C. 1983) (introduction of inflammatory and prejudicial evidence mandates reversal). Appellant's theory of prejudice is premised on the thesis that because appellant's counsel conceded negligence prior to the accident, the only purpose of the defense in eliciting evidence of drunkenness must have been to inflame the jury against his cause.[5] But under a case decided by this court, also involving an automobile accident-even a concession of liability does not foreclose the opposing party from presenting such evidence. In *Hayes v. Sutton*,

190 A.2d 655 (D.C.1963), an action for damages by passengers in a cab struck by defendant's car, defendant informed the jury in advance of trial that he was at fault and that the only issue was the amount of damages. Nevertheless, plaintiff's counsel was permitted to show that the defendant was intoxicated at the time of the accident. On appeal, defendant argued—as appellant has done in this case-that his condition was irrelevant and hence testimony as to his intoxication served only to inflame the jury against him. This court, refusing to find error in the ruling admitting such testimony, rejected his argument, observing:

> Whether in a given case a defendant's intoxication bears so directly on the force of the impact, and therefore on plaintiff's damages, as to make evidence on this issue relevant despite its possible inflammatory effect on the jury is again a determination which is best left to the discretion of the trial court. At the trial below testimony as to appellant's intoxication was permitted on the ground that his condition at the time of the accident and immediately before would affect his ability to recall factors relating to the force of the impact, such as his speed and awareness of impending danger. The record discloses that the court narrowly circumscribed questioning by appellees' counsel on this issue, and that the testimony was reasonably related to the matters in dispute. We find no abuse of discretion.

*Id.* at 656.

Some of the comments in the *Hayes* opinion have a certain bearing on the challenged admissibility of the evidence of appellant's own intoxication at the time of the accident. For example, appellant's befuddlement would also have explained why testimony concerning his spasmodic movements when attempts to extricate him were in progress, was a factor to be considered in appraising the conduct of the rescue personnel. Accordingly, the trial judge in

---

**5.** To presume prejudice requires reliance on the undocumented premise that an average jury in this city would regard the spectacle of college students drinking too much beer on a weekend frolic as so shocking and abhorrent that it would be unlikely to render an impartial verdict.

his broad exclusionary instruction gave a ruling more favorable to appellant than was required by the *Hayes* decision.

Moreover, the testimony concerning the pre-accident events was a relatively tiny segment of the voluminous transcript of a ten-day trial. As appellant, in designating the record on appeal, did not include the transcript of his own direct testimony, this court has no way of determining whether the questions put to him by defense counsel were outside the scope of cross-examination. We cannot infer that such questions were improper.

Finally, the evidence of intoxication was far from the main focus of the District's defense. There was evidence that the spinal cord was damaged upon impact, supported by Dr. Kobrine's testimony, as well as the descriptive testimony of eyewitnesses to the accident, which apparently convinced the jury that the severity of plaintiff's injury could not be attributed to any action or inaction of District employees.

Even accepting the thesis that the testimony establishing the intoxication of the driver and his passengers was not a valid contributory negligence defense and therefore should have been excluded,[6] we hold that reversal of the challenged judgment is not warranted. A well-established princi-

ple is that a curative instruction effectively remedies the prejudicial effect of irrelevant evidence, improper questions, or inflammatory argument.[7] The law of this jurisdiction on a trial court's instruction to disregard certain prejudicial testimony was succinctly stated in a recent decision, *Brock v. United States*, 404 A.2d 955, 959 (D.C.1979) (footnote omitted), as follows:

> We have reviewed the appellant's other claims and find no reversible error. The trial court had attempted to keep reference to the starter pistol and the blackjack out of the trial ... an improper reference ... made by the arresting officer. The denial of mistrial was not an abuse of discretion. An immediate curative instruction was given. "A crucial assumption underlying [our system of trial by jury] is that juries will follow the instructions given them by the trial judge." *Parker v. Randolph*, 442 U.S. 62, 73, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713 (1979).

If this is the rule to be applied in criminal cases where liberty is at stake, *a fortiori*, we must defer to it in litigation concerned only with money damages.

■ Ordinarily we must presume that the jury obeyed the instruction and ignored the inadmissible evidence. *Hall v. United*

---

6. RESTATEMENT (SECOND) OF TORTS § 468 (1965), reads:

> There is a difference to be noted between negligence and contributory negligence. Where the negligence of a defendant creates a risk of particular harm, occurring in a particular manner, and the same harm is in fact brought about in another manner through the operation of some intervening force which was not one of the hazards making up the original risk, the defendant normally is not relieved of responsibility by the intervention of the force, and is liable for the harm.... *But where the negligence of the plaintiff creates a risk of a particular harm to him, occurring in a particular manner, and the same harm is in fact brought about by the intervention of a force which was not one of the original hazards, the plaintiff is not barred from recovery....*
> *Id.* at § 468 comment c (emphasis added).

7. *E.g., Carpenter v. United States*, 430 A.2d 496, 506 (D.C.) (on appeal from conviction for burglary and grand larceny, held that trial court's cautionary instructions to the jury sufficed to

ameliorate any prejudice from inadmissible, incriminating reference to defendant from police officer's testimony recounting codefendant's confession), *cert. denied*, 454 U.S. 852, 102 S.Ct. 295, 70 L.Ed.2d 143 (1981); *United States v. Patterson*, 161 U.S.App.D.C. 281, 285–86, 495 F.2d 107, 111–12 (1974) (appeal from conviction of illegal possession of certain firearms held that impropriety of prosecutor's questions linking defendant with shooting of another man at place of arrest cured by prompt instruction); *Jones v. United States*, 343 A.2d 346, 353 (D.C. 1975) (conviction for armed robbery not reversible on grounds of improper closing argument of prosecutor where adequate curative instruction was given). As this court has recognized, this rule is applicable in damage actions, *e.g., Psychiatric Institute of Washington v. Allen*, 509 A.2d 619 (D.C.1986); *Smith v. Rogers Memorial Hospital*, 382 A.2d 1025, 1028 (D.C.), *cert. denied*, 439 U.S. 847, 99 S.Ct. 146, 58 L.Ed.2d 148 (1978), and authorities cited. *See also Hayes v. Sutton, supra*, 190 A.2d at 656 (where trial court's failure to instruct jury not to consider evidence eventually deemed irrelevant was held reversible error).

*States,* 84 U.S. App.D.C. 209, 211, 171 F.2d 347, 349 (1948). Nevertheless, the presumption of jury compliance with instructions is inapplicable if "the contrary appears, or the circumstances are very unusual." *Id.* at 211, 171 F.2d at 349.[8] A review of the transcript reveals that neither exception applies to the case at hand.

■ Contrary to one suggestion, we discern no hint of any tendency on the part of this jury to disregard judicial admonitions because of the way it handled the special interrogatories submitted to it. It is true that one of the court's instructions was that it was unnecessary for the jury to go on to consider the second question (proximate cause) unless it answered the first question in the affirmative (*i.e.,* had found District employees negligent in their treatment of plaintiff). The jurors, however, were given no instruction as to what they should do, were they unable-as it turned out-to reach unanimity on this issue. Having been told in the closing instructions that unless they decided that both negligence and proximate cause were established by a preponderance of the evidence they should return a verdict for the defendant, the jurors correctly recognized that the deadlock on the first issue was academic unless they found that the assertedly negligent conduct was the cause of the spinal cord injury. Accordingly, they turned to that question and discovered that irrespective of whether the treatment of plaintiff by the ambulance personnel was negligent, none of them deemed the plaintiff's partial paralysis was due to such conduct. Having reached a unanimous vote on this issue, the jury did not confront the parties with a *fait accompli* by announcing its verdict, but sought further judicial direction.

Apparently aware that the procedural instructions of the court had overlooked the possibility of a divided vote on the first question, the jury sent the following note to the court:

> *We request your guidance, if possible.* We cannot reach a unanimous vote on Number 1. We can and have reached a unanimous vote on Number 2. (Emphasis added.)

As the foregoing text discloses, the jury, far from disobeying instructions, was most deferential to the trial judge. It even abstained from announcing its verdict until given further instructions. The reaction of neither the judge nor the parties to this message was that the jurors had been disrespectful. It was not until after lengthy colloquy between the court and counsel that the point was finally made that if the jury's unascertained answer to the second question was "no," further proceedings were unnecessary. After soliciting further advice, the court decided the most expeditious method of responding to the jury's request for guidance was to learn the result of the unanimous vote. A note asking for this information was transmitted to the jury. As this produced an ambiguous reply, the court finally recalled the jury and instructed it to state its verdict in open court. In short, there is nothing in the record which suggests that the jury acted "contrary" to instructions at any stage of the trial. Nor did "very unusual" circumstances exist; the introduction of testimony which may have been irrelevant was far from a major feature of the defense evidence. This case, therefore, is not governed by the exceptions noted in *Hall, supra.*

■ Appellant has advanced as error certain other rulings of the trial court. We have examined these contentions, but find no merit in them.[9]

*Affirmed.*

---

8. In *Hall supra,* the court expressly invoked the principle of jury deference to judicial directives to affirm a jury conviction and death sentence notwithstanding an extremely prejudicial remark of the prosecutor (stricken by the trial court on defense objection).

9. We reject appellant's argument that Dr. Kobrine's testimony should have been stricken as "incompetent and based on speculation." The doctor fully explained the basis of his opinion. Although his testimony was far from conclusive, there was a sufficient factual predicate for it, and it was therefore admissible. *See Sponaugle v. Pre-Term, Inc.,* 411 A.2d 366, 367 (D.C.1980) (expert testimony admissible "so long as it is not a mere guess or conjecture").

TERRY, Associate Judge, dissenting:

With all respect, I cannot join my colleagues in affirming the judgment. I would reverse on the ground that the evidence relating to Gannon's intoxication was irrelevant, inadmissible, and so inflammatory as to deprive appellant of a fair trial.

**I**

In addition to defending against the negligence claim on the merits, the District—over appellant's objection—attempted to establish that appellant was guilty of contributory negligence because he voluntarily rode as a passenger in John Gannon's car knowing that Gannon was drunk.[1] In his opening statement, counsel for the District alerted the jury to this aspect of its case:

The evidence in this case will show that Mr. Weeda, Mr. Langley, and Mr. Gannon spent the evening of October 5th drinking. They visited at least a couple of bars. At around two o'clock on the morning of October 6th, they closed down a bar at 21st and Pennsylvania Avenue. Mr. Gannon had driven Mr. Langley and Mr. Weeda to that bar in a 1974 subcompact automobile. When they left the bar at around two o'clock that morning, the testimony will show that Mr. ... Gannon had drunk at least fifteen beers. He was drunk. And the evidence will further show that Mr. Weeda knew that he was drunk. He not only knew that he was drunk, but his ability—his ability to drive was seriously impaired.

Thereafter counsel for the District, at every opportunity, elicited testimony to show that Gannon was drunk at the time of the accident and that appellant knew he was drunk. In his cross-examination of appellant, each and every question was related to this point:

Q. Mr. Weeda ... on that night you first went over to John Gannon's house?

A. Yes.

Q. You had something to drink there? So did Mr. Gannon?

A. Yes.

Q. Then you went to a bar called "Manny's" on Wisconsin Avenue?

A. Yes.

Q. And Mr. Gannon again had some more drinks there? And then you went to "The 21st Amendment" and you all had some more drinks there?

A. Yes.

Q. You were drinking beer that night, weren't you?

A. Uh-huh.

Q. When you left "The 21st Amendment" that night, you knew that Mr. Gannon was drunk, didn't you?

A. Yes.

Q. You knew that he would change lanes more quickly than usual?

A. Yes.

Q. He would make much sharper turns than normal?

A. Not every turn.

Q. I understand. But he would make the turns more sharply than usual?

A. Yes.

Q. He would also drive a lot faster than when he was not drunk?

A. No, he wouldn't drive a whole lot faster.

Q. He would drive faster?

A. Right.

\*    \*    \*    \*    \*    \*

We also reject appellant's contention that the trial court abused its discretion in limiting his cross-examination of Dr. Kobrine. Although the court did sustain several objections to counsel's questions, it informed counsel upon the last objection that it was only as to the "form of the question." At this point, counsel responded that he had no further questions of Dr. Kobrine. In these circumstances, we find no abuse of discretion. *See, e.g., Beynum v. United States,* 480 A.2d 698, 706–707 (D.C.1984).

Nor do we find error in the trial court's insertion of an explanatory phrase in the special interrogatories.

1. Appellant conceded at trial that his conduct was negligent but argued—as he does now—that contributory negligence was not a valid defense to his claim against the District of Columbia, and that the evidence to support that defense was therefore irrelevant and inadmissible.

Q. In fact, Mr. Weeda, you thought that Mr. Gannon was a drunken, wild driver, didn't you?

A. All the time?

Q. Not all the time. But on the occasion of this accident.

A. [Pause] I wouldn't say "wild." That is going a bit too far. But he was—he was drunk on the night of the accident.

\* \* \* \* \* \*

Q. You permitted him to drive away from that scene even though you knew that he was drunk?

A. Yes.

The District called John Gannon to the stand and again elicited testimony to support its theory that appellant was contributorily negligent. The entire direct examination of Gannon centered on this defense:

Q. Mr. Gannon, you were the driver of the automobile on the night that Mr. Weeda was injured?

A. Yes, I was.

Q. On October 5th, you left your house at about eight o'clock?

A. Around eight o'clock.

Q. Before you left your house, you had some beers to drink?

A. Yes.

Q. When you went out, you went out socializing with your friends, Mr. Langley and Mr. Weeda?

A. Yes.

Q. You were going out drinking with your friends?

A. Well, that was part of it.

Q. You went to "The 21st Amendment." That is a bar in downtown D.C.?

A. Yes.

\* \* \* \* \* \*

Q. You stayed at "The 21st Amendment" until almost closing time?

A. Yes.

Q. That would have been close to two o'clock?

A. Yes.

Q. While you were at "The 21st Amendment," you continued to drink beer, did you not?

A. Yes.

\* \* \* \* \* \*

Q. Mr. Gannon, your physical abilities were impaired on the night of the accident because of alcohol, were they not?

A. Yes.

Q. Your reaction time was slowed?

A. Yes.

Q. Your vision was impaired?

A. As far as I remember—it may have been impaired, yes.

Q. In fact, you were too drunk to drive that night, were you not?

A. Yes.

The District also introduced a medical record to show that Gannon's blood alcohol level was .24 percent at the time of the accident, and presented testimony from a toxicologist to show that after he had drunk approximately fifteen beers, Gannon's judgment, reflexes, and vision were impaired.

At the close of all the evidence, the court ruled that appellant's conduct on the night of the accident was negligent as a matter of law—which appellant never disputed—and that there was no factual issue for the jury to resolve with respect to *his* negligence. Accordingly, the court instructed the jury to disregard the evidence concerning appellant's negligence. It also submitted two special interrogatories to the jury and charged it to answer question No. 1 first, and to consider question No. 2 only if it answered question No. 1 in the affirmative.[2]

After one day of deliberations, the jury informed the court that it had not reached a unanimous decision on the first interrogatory, but that it had, *contrary to the court's instructions,* considered the second and unanimously agreed that the "alleged negligent acts or omissions of the employees of the District" did not proximately cause appellant's quadriplegia. Upon this

**2.** The instruction and the two special interrogatories are quoted in the majority opinion, *ante* at 1161–1162.

finding the jury was discharged and judgment entered in favor of the District.

## II

Contributory negligence is a valid defense to a personal injury action if, but only if, the plaintiff's injury results from the particular hazard or risk which made his conduct negligent. RESTATEMENT (SECOND) OF TORTS § 468 (1965); *see, e.g., Helsley v. County of Kern,* 42 Cal.App.3d 97, 106, 116 Cal.Rptr. 518, 522–523 (1974); *Preece v. Harless,* 662 S.W.2d 839, 842 (Ky.App.1983); *Nesta v. Meyer,* 100 N.J.Super. 434, 444–445, 242 A.2d 386, 391 (1968); *Kulaga v. State,* 37 A.D.2d 58, 61–62, 322 N.Y.S.2d 542, 545–546 (1971), *aff'd,* 31 N.Y.2d 756, 290 N.E.2d 437, 338 N.Y.S.2d 436 (1972); *Fahringer v. Rinehimer,* 283 Pa.Super. 93, 97–98, 423 A.2d 731, 733–734 (1980). In the words of the Restatement:

> There is a difference to be noted between negligence and contributory negligence. Where the negligence of a defendant creates a risk of a particular harm, occurring in a particular manner, and the same harm is in fact brought about in another manner, through the operation of some intervening force which was not one of the hazards making up the original risk, the defendant normally is not relieved of responsibility by the intervention of the force, and is liable for the harm.... *But where the negligence of the plaintiff creates a risk of a particular harm to him, occurring in a particular manner, and the same harm is in fact brought about by the intervention of a force which was not one of the original hazards, the plaintiff is not barred from recovery....*

RESTATEMENT, *supra* at § 468 comment c (emphasis added). This difference between negligence and contributory negligence is due to the "more restrictive attitude of the courts toward contributory negligence, as compared with negligence, and their tendency to confine it within somewhat narrower limits." *Id.*

In medical malpractice cases, for example, contributory negligence is a valid defense if the patient's negligent act concurs with that of the physician and creates an unreasonable risk of improper medical treatment. *See, e.g., Rochester v. Katalan,* 320 A.2d 704 (Del.1974) (contributory negligence held to be a valid defense when a patient who solicited medication falsely told a physician he was a heroin addict, manifested symptoms of heroin withdrawal, and failed to reveal that he had consumed alcohol and librium earlier that day); *Musachia v. Rosman,* 190 So.2d 47 (Fla. App.1966) (contributory negligence held to be a valid defense when a patient failed to abide by his physician's instructions); *Champs v. Stone,* 74 Ohio App. 344, 58 N.E.2d 803 (1944) (contributory negligence held to be a valid defense when a patient submitted to an injection by a physician who was grossly intoxicated). In such cases the defense is allowed because the patient's injuries directly result from the particular hazard or risk which made his conduct negligent.

On the other hand, if the patient's negligent act merely precedes that of the physician and provides the occasion for medical treatment, contributory negligence is not a permissible defense. *See, e.g., Matthews v. Williford,* 318 So.2d 480 (Fla.App.1975); *Lamoree v. Binghamton General Hospital,* 68 Misc.2d 1051, 329 N.Y.S.2d 85 (N.Y. Sup.Ct.1972); *Sendejar v. Alice Physicians & Surgeons Hospital, Inc.,* 555 S.W.2d 879 (Tex.Civ.App.1977); *cf. Whitehead v. Linkous,* 404 So.2d 377 (Fla.App. 1981). In such a case the physician's negligent act constitutes an intervening force, and the patient is therefore not barred from recovery.

In the instant case, appellant's conduct on the night of the accident was negligent because it created an unreasonable risk that he would be injured in an automobile accident. Consequently, if this had been a trial on appellant's claim *against Gannon* for injuries sustained *in the automobile accident,* Gannon could have successfully asserted the defense of contributory negligence. *E.g., Todd v. Jackson,* 109 U.S. App.D.C. 7, 283 F.2d 371 (1960). This is so because appellant's injuries resulted from the particular hazard or risk which made his conduct negligent. Appellant's suit,

however, was not against Gannon but against the District of Columbia. He sought damages not for injuries he sustained in the automobile accident but for injuries he sustained *after* the accident—injuries which he claimed were a direct and proximate result of improper emergency care by his rescuers, the District's agents. Since these injuries did not result from the particular hazard or risk which made appellant's conduct negligent, *i.e.*, his riding in a car with a drunken driver, but were allegedly brought about by an intervening cause, *i.e.*, the negligence of the rescuers, contributory negligence was not a valid defense. *See* RESTATEMENT, *supra* at § 468. Consequently, the evidence that Gannon was intoxicated at the time of the accident and that appellant knew he was intoxicated was irrelevant and inadmissible.

The trial court acted correctly when it instructed the jury to disregard the evidence of appellant's negligence, but by then it was too late to repair the damage. Ordinarily, this court would presume (and indeed the majority does presume) that the jury obeyed the instruction and ignored the inadmissible evidence. "[U]nless the contrary appears, or the circumstances are very unusual ... jurors should be presumed to have understood and followed the court's instructions." *Hall v. United States*, 84 U.S.App.D.C. 209, 211, 171 F.2d 347, 349 (1948) (citations omitted). I do not believe we can apply the presumption here, however, for two reasons. First, the record affirmatively shows that the jury disregarded another instruction from the court, namely, the specific instruction that it should consider and answer the first interrogatory before moving on to the second. Thus, in the words of *Hall*, "the contrary appears." Second, and more significantly, "the circumstances are very unusual." The evidence of appellant's negligence was highly inflammatory and quite extensive.[3] Appellant's awareness of Gan-

non's intoxication was a major element of the District's defense, and counsel for the District hammered away at it whenever he could. The District sought to depict appellant and his companions not as three nice young men out on a harmless lark, but as three wild and dangerous drunks. On this record, with such repeated emphasis on inadmissible evidence, no instruction could have cured the prejudice. *See Smith v. Executive Club, Ltd.*, 458 A.2d 32, 42 (D.C. 1983); *Penwell v. District of Columbia*, 31 A.2d 891, 893 (D.C.1943); *Rice v. Louisville & N.R.R.*, 309 F.2d 930, 933–934 (6th Cir.1962); *Worcester v. Pure Torpedo Co.*, 127 F.2d 945, 947–948 (7th Cir.1942).

The evidence of Gannon's intoxication, and of appellant's awareness of it, was not relevant to any valid defense in this case.[4] In my view it was inflammatory in the extreme, and its admission tainted the entire proceedings. I would reverse the judgment and remand this case for a new trial.

---

3. I cannot agree with the majority that "the evidence of intoxication was far from the main focus of the District's defense." *Ante* at 1163. While the District also relied on the expert testimony of Dr. Kobrine and its attempt to discredit the testimony of Mr. Podell, the intoxication evidence was a significant part of its case.

4. I agree with the majority that the evidence of appellant's intoxication (as opposed to Gannon's) had some relevance—not much, but enough to make it admissible. *See ante* at 1161.